1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

JAMES F. (JAY) LEVIAS and
ANTHONY LEMON, individually and
on behalf of a class of all similarly
situated claimants,

         Plaintiffs,

      v.

PACIFIC MARITIME ASSOCIATION;
EAGLE MARINE SERVICES, INC.;
MARINE TERMINALS
CORPORATION; SSA TERMINALS,
LLC; STEVEDORING SERVICES OF
AMERICA, INC. (a/k/a SSA), SSA
MARINE, INC., SSA TERMINALS,
INC.; APM TERMINALS PACIFIC,
LTD.; HUSKY TERMINAL AND
STEVEDORING, INC.; PACIFIC
CRANE MAINTENANCE COMPANY,
L.P.; SEA STAR STEVEDORE
COMPANY; and WASHINGTON
UNITED TERMINALS,

         Defendants

      and

INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION,

         Intervenor-Defendant.

Case No. 08-cv-1610-JPD

ORDER DENYING PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

# I.    INTRODUCTION AND SUMMARY CONCLUSION

This matter comes before the Court on Plaintiffs' Motion for Class Certification. Dkt. No. 47. Plaintiffs seek certification under Rule 23 of the Federal Rules of Civil Procedure of a class of all longshore workers who were dispatched from a dispatch hall in Washington State to a job site and were not compensated for pre-shift travel, wait and work time. *Id.* at 6. After considering Plaintiffs' motion, Dkt. No. 47, Defendants' opposition, Dkt. No. 51, the Intervenor-Defendant's opposition, Dkt. No. 54, and Plaintiffs' reply brief, Dkt. No. 64, the governing law and the balance of the record, Plaintiff's Motion for Class Certification, Dkt. No. 47, is DENIED.

# II.    BACKGROUND

Defendant Pacific Maritime Association ("PMA") is a multi-employer bargaining association which represents approximately 70 employer-members in their dealings with the union and its locals that represent longshore workers in ports in California, Oregon and Washington. Intervenor-Defendant International Longshore and Warehouse Union ("ILWU") is the union that represents the longshore workers in all three states. PMA's employer-members are stevedoring and shipping companies and marine terminal operators. The additional 11 defendants in this action are all PMA members that have employed longshore workers in the ports of Washington State. There are 11 ports in Washington, the largest of which are Seattle, Tacoma, Vancouver and Longview. The seven smaller ports are Aberdeen/Grays Harbor, Anacortes, Port Angeles, Port Gamble, Olympia, Everett and Bellingham. Seattle and Tacoma are container ports while the others are not.

Plaintiffs James F. Levias and Anthony Lemon are longshore workers who work at the Port of Seattle. Mr. Levias is a Class B registered longshore worker and Mr. Lemon is a Class A registered longshore worker. In order for Plaintiffs and all other longshore workers in Washington to obtain work each day, they must first go to a dispatch hall. The exceptions are those longshore workers who obtain a steady job working for a single employer on an

ongoing basis, and those who work a multi-day job or a call-back job. According to the ILWU, a union-run dispatch hall is used to fairly and equitably distribute available longshore work, and is a bulwark against the cronyism and favoritism that historically controlled the distribution of longshore work at the ports on the West Coast. Available longshore work is uneven and not guaranteed, and depends on variables such as the number of ships in port and the amount of cargo to be loaded or unloaded. The ILWU considers the dispatch hall to be sacrosanct, an integral part of the union's culture and a "safe harbor" for longshore workers from management and employers. There are 12 dispatch halls used for dispatching longshore workers to the 11 ports in Washington.

After waiting and receiving a job assignment at their dispatch hall, longshore workers must travel to their assigned port terminal, which is some variable distance from the dispatch hall (generally three to ten minutes by car). Workers may also need to walk or take a shuttle to the assigned job site at the terminal. In addition to working for different employers, there are a multitude of possible longshore job assignments with different routines, procedures and pay practices, including semi-driver, forklift operator, log stacker operator, reachstacker driver, crane operator, "top pick" operator, straddle carrier ("strad") driver, porter, slingman, stevedore, lasher, clerk, houseman and gearman, among others. Longshore workers may be dispatched to a different job assignment each day. Once at the job site, workers must assemble or muster and wait for the shift to begin. In addition, some workers claim, start up and inspect equipment or semis that they will use on the shift. Plaintiffs contend that the foregoing pre-shift travel, wait and work time is compensable and should have been paid by PMA and it members under the Washington Wage Statute ("WWS") and the Fair Labor Standards Act ("FLSA").

On October 6, 2008, Mr. Levias filed the instant proposed class action in King County Superior Court, alleging violations of the WWS. Dkt. No. 5, Att. 1. The original named defendants soon removed the action to federal court. Dkt. No. 1. On February 19, 2009, Mr.

Levias filed a stipulated motion to dismiss certain defendants and to add new defendants to his original complaint. Dkt. No. 14. On March 5, 2009, the ILWU was permitted to intervene as an intervenor-defendant in the action. Dkt. No. 15. On March 6, 2009, Mr. Levias filed a first amended complaint which named the new defendants, Dkt. No. 16, and on August 21, 2009, Mr. Levias filed a second amended complaint, which added a new claim for violation of the FLSA and also added a new plaintiff, Anthony Lemon, Dkt. No. 44.

Plaintiffs now move for class certification under Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek to certify the following class:

> The class of all longshore workers who appeared at and were dispatched from any dispatch hall in the state of Washington to any job for the PMA and/or any of its members over the period commencing six years from the date this action was filed (i.e., October 3, 2002) to present and was not paid for pre-shift time, including travel time from the dispatch hall, wait time at the job site, and/or pre-shift preparation time while at the job site. Excluded from the class are workers who during the entire class period were longshore foremen and/or officers of the Defendant PMA and its members.

Dkt. No. 47 at 6.

The parties agree that the proposed class consists of at least several hundred longshore workers. *See, e.g.,* Dkt. No. 61 at 7.

### III. DISCUSSION

#### A. Rule 23(a) Requirements for Class Certification

In determining whether class certification is appropriate, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather, whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974). Although a district court may not investigate the likelihood of prevailing on the merits, he or she is at liberty to consider evidence relating to the merits if such evidence also goes to the requirements of Rule 23. *Howard v. Gap, Inc.*, 2009 U.S. Dist. LEXIS 105196, at *6 (N.D. Cal. Oct. 29, 2009). The party seeking class certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one of the

three requirements of Rule 23(b) are met. *See United Steel v. ConocoPhillips Co.*, ___ F.3d ___, 2010 U.S. App. LEXIS 238, at \*11-13 (9th Cir. Jan. 6, 2010). The four requirements of Rule 23(a) are: (1) numerosity of the class; (2) common questions of law or fact; (3) the named plaintiffs' claims or defenses are typical of the class; and (4) the named plaintiffs can fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a).

### 1. Numerosity

"The prerequisite of numerosity is discharged if 'the class is so large that joinder of all members is impracticable.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) (quoting FED. R. CIV. P. 23(a)(1)). Here, Plaintiffs seek to represent all longshore workers from October 3, 2002 to the present who were dispatched from a dispatch hall in Washington State to a job site and were not compensated for pre-shift travel, wait and work time. Dkt. No. 47 at 6. The Court finds that Rule 23(a)(1)'s numerosity requirement is satisfied. Defendants and the ILWU do not contend otherwise.

### 2. Commonality

Rule 23(a)(2) requires that there be "questions of law *or* fact common to the class." FED. R. CIV. P. 23(a)(2) (emphasis added). The Ninth Circuit has explained that "[a]ll questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon*, 150 F.3d at 1019. Rule 23(a)(2)'s commonality requirement is less rigorous than the companion requirements of Rule 23(b)(3). *Id.* Indeed, the Ninth Circuit has held that Rule 23(a)(2)'s commonality requirement is "minimal" and should be construed permissively. *Id.* at 1019-20.

The Court finds that Plaintiffs satisfy Rule 23(a)(2)'s commonality requirement. Plaintiffs allege, at a minimum, three common questions of law under the WWS and the FLSA: (1) whether the putative class members are entitled to be paid for travel time from the dispatch hall to the job site; (2) whether the putative class members are entitled to be paid for

pre-shift wait time; and (3) whether the putative class members are entitled to be paid for pre-shift work time. *See* Dkt. No. 47 at 12. While each putative class member's claim involves individualized facts, as will be described below, this is insufficient to defeat Rule 23(a)(2)'s permissive commonality requirement. As noted above, the Ninth Circuit has held that the existence of shared legal issues with divergent facts is sufficient to satisfy Rule 23(a)(2).

### 3. Typicality

The typicality requirement of Rule 23(a)(3) is satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). A named plaintiff's claims are typical of the class if they "are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. A class representative must "possess the same interest and suffer the same injury" as the class members. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 156 (1982) (internal quotation marks omitted). In other words, the typicality prerequisite requires that, "as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. GMC*, 133 F.3d 388, 399 (6th Cir. 1998).

Here, Plaintiffs have not met their burden to demonstrate that they satisfy the typicality requirement. In short, Plaintiffs' individual claims vary significantly from the claims of the putative class members. During the relevant period, Mr. Lemon generally only worked at the Port of Seattle on equipment jobs that paid an extra hour at the beginning and end of the shift, in addition to the regular eight "straight time" hours. Dkt. No. 52, Weber Decl., Exh. G. These equipment jobs are known as "8 + 2" jobs, and the additional two hours are meant to cover any additional work time before or after the shift, regardless of whether the time is actually spent working. *See* Dkt. No. 52, Weber Decl., ¶ 20. Mr. Lemon's seniority enables him to obtain these lucrative jobs, which account for Mr. Lemon's above-average hours paid and earnings, which in 2008 were nearly 3077 hours and $133,000, respectively. *Id.*, Exh. I. This evidence of Mr. Lemon regularly working "8+2" jobs makes it difficult to

conceive how Mr. Lemon would be entitled to any relief in this action given that the extra two hours would cover any claimed pre-shift travel, wait or work time. Although the Court is not to look at the merits, this evidence bears on the requirements of Rule 23, namely, the lack of typicality of Mr. Lemon's claims.

In addition, at all material times, Mr. Levias was a truck driver who worked at the Port of Seattle. Dkt. No. 52, Weber Decl., Exh. H. This means that Mr. Levias' work experience is akin to only a narrow group of workers within the putative class. However, he is seeking to represent a class of longshore workers that covers a multitude of ports, terminals, job sites, dispatch halls, travel distances, employers, wait times, job assignments, routines, procedures and pay practices. Unlike with Mr. Levias, many of these workers' job assignments vary day by day, which is further evidence that Mr. Levias' claims are not typical.

Moreover, Mr. Lemon is a Class A registered longshore worker, so he has greater seniority and receives first preference for available jobs at the dispatch hall. Dkt. No. 56, Ventoza Decl., ¶ 4. Mr. Levias is a Class B registered longshore worker, so he receives second preference in available jobs. *Id.* This means that they are generally dispatched early and have more time before the shift begins than other longshore workers. Indeed, many longshore workers lacking seniority do not receive their job assignments until just prior to the beginning of the shift. This additional time provides Mr. Lemon and Mr. Levias with greater autonomy over their time before their shift, and enables them to report to the job site when they choose. In contrast, other less senior longshore workers must remain at the dispatch hall to await a job assignment, and often have no choice but to report directly to the job site once they receive the assignment. Accordingly, Plaintiffs' claims lack typicality, as they have greater flexibility and control over their time prior to the shift's start time than many of the putative class members. This autonomy places Plaintiffs' claims on different footing than the claims of less senior workers.

1    Plaintiffs' seniority also means that they have greater opportunity to work call-back or
2    multi-day jobs.  Longshore workers on call-back or multi-day jobs are allowed to bypass the
3    dispatch hall and may report directly to the job site each day.  On the other hand, less senior
4    workers have to report to the dispatch hall on a daily basis.  Plaintiffs' claims for paid travel
5    time concern the time spent traveling from the dispatch hall to the job site.  However, because
6    Mr. Levias and Mr. Lemon frequently need not report to the dispatch hall, this renders their
7    individual claims for paid travel time atypical of the claims of the class.

8        The Court cannot conclude that Plaintiffs' claims are typical of the putative class in
9    view of Plaintiffs' seniority and rather limited work experiences vis-à-vis the class.
10   Accordingly, Rule 23(a)(3)'s typicality prerequisite is not satisfied.

11                   4.      Adequacy

12       Rule 23(a)(4)'s adequacy requirement ensures that absent class members are afforded
13   competent representation before entry of a judgment which binds them.  *Hanlon*, 150 F.3d at
14   1020.  "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs
15   and their counsel have any conflicts of interest with other class members and (2) will the
16   named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Id.*

17       Here, Plaintiffs' interests conflict with the interests of the putative class members.
18   Most significantly, Plaintiffs and the putative class members are union members whose
19   interests have long been represented by the ILWU, and the ILWU has intervened in this action
20   and vigorously opposes Plaintiffs' lawsuit.  The ILWU characterizes the lawsuit as a "frontal
21   and dangerous assault" on the union-run dispatch hall, which according to the ILWU is
22   required for the equalization of longshore work among the union's members, which "can only
23   be achieved and protected by rotation of jobs from member to member from the hiring hall
24   instead of at the workplace under the control of the employers."  Dkt. No. 54 at 25; *see* Dkt.
25   No. 13, Sundet Decl., ¶ 12, Exh. A.  The ILWU's point is well taken, because if longshore
26   workers are deemed "on the clock" at the employers' expense from the moment they leave the

dispatch hall, which for some may be nearly an hour before the shift starts, the employers have a credible case that the dispatch hall is superfluous and should be abolished, and that work assignments can be determined by the employers and communicated via telephone, the internet or at the various job sites. The ILWU contends that the Plaintiffs' position in this lawsuit is "fundamentally at odds with one the core principles of the ILWU and its membership," and there is nothing in the record to persuade this Court otherwise. Indeed, members of union management from the four major ports in Washington are unaware of any grievances being filed by union members regarding claims of the kind being asserted by Plaintiffs. Dkt. No. 56, Ventoza Decl., ¶ 31; Dkt. No. 57, Spell Decl. ¶ 27; Dkt. No. 58, Clark Decl., ¶ 16; Dkt. No. 59, Norton Decl., ¶ 16. If Plaintiffs' claims had support among the union membership, it is reasonable to expect that grievances similar to Plaintiffs' claims would have been filed by the union's members.

In addition, as mentioned above, for the relevant period Mr. Lemon generally only worked on "8+2" jobs, which means that he was paid an extra hour at the beginning and end of his shift, no matter what. Dkt. No. 52, Weber Decl., Exh. G. Mr. Lemon is able to take advantage of this favorable pay practice by virtue of his seniority. The extra two hours of pay, in addition to the eight hours of paid "straight time," raises grave doubts about whether Defendants could have any liability to Mr. Lemon on his claims for unpaid pre-shift travel, wait and work time. Accordingly, the Court cannot conclude that Mr. Lemon can adequately represent the interests of the putative class members.

It is also worth mentioning that Mr. Levias has a separate pending lawsuit against Defendant PMA and Intervenor-Defendant ILWU that could potentially create a conflict with the putative class. *See Levias v. Pacific Maritime Association, et al.*, Case No. 09-cv-0302-RSL. Presumably, Mr. Levias has a greater financial interest in his individual lawsuit, which challenges his current status as a Class B registered longshore worker, and seeks lost pay and benefits and lost economic opportunity. *Id.*, Dkt. No. 1. The potential exists for a favorable

settlement in the individual action that might undermine the loyalty of Mr. Levias to the putative class in this matter.  At a minimum, a favorable settlement in the individual action could provide a disincentive to vigorously prosecute this action on behalf of the class.  *See Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 678-79 (N.D. Ohio 1995) (finding named plaintiffs were inadequate, and noting that "absent class members were at great risk of being sold out" to achieve a greater recovery in the named plaintiffs' separate action).  In sum, Plaintiffs are inadequate class representatives because of actual and potential conflicts with the putative class, and the adequacy requirement is not met.[1]

B.      Rule 23(b) Requirements for Class Certification

Plaintiffs seek to certify the class under Rule 23(b)(3).  Dkt. No. 47 at 14.  Class certification under Rule 23(b)(3) requires that the district court find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  FED. R. CIV. P. 23(b)(3).  Accordingly, there are two requirements of Rule 23(b)(3): (1) predominance of common issues and (2) the superiority of a class action to adjudicate the dispute.

1.      Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  The commonality preconditions of Rule 23(b)(3) are more rigorous than the companion commonality requirements of Rule 23(a)(2).  *Hanlon*, 150 F.3d at 1019.  As noted above, Rule 23(a)(2) has been construed permissively such that the "existence of shared legal issues with divergent factual predicates is sufficient, as is a

---

[1]      The Court finds that Plaintiffs' counsel are qualified and competent to represent the proposed class, and would vigorously prosecute the action on its behalf.  However, the adequacy of counsel is insufficient to overcome the Plaintiffs' conflicting interests with the proposed class they seek to represent.

common core of salient facts coupled with disparate legal remedies within the class." *Id.* Rule 23(b)(3), in contrast, requires not just that, for example, some common legal questions exist, but that those common legal questions predominate over individual questions. In *Hanlon*, the Ninth Circuit discussed the relationship between Rule 23(a)(2) and Rule 23(b)(3) as follows:

> The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. This analysis presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3). In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues. When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis.

*Hanlon*, 150 F.3d at 1022 (citations and internal quotation marks omitted). To determine whether the predominance requirement is satisfied, "courts must identify the issues involved in the case and determine which are subject to generalized proof, and which must be the subject of individualized proof." *In re Dynamic Random Access Memory Antitrust Litigation*, 2006 U.S. Dist. LEXIS 39841, at *38 (N.D. Cal. June 5, 2006) (internal quotation marks omitted).

After carefully reviewing the record, the Court concludes that individual questions predominate over any common questions. Plaintiffs seek to represent a class of all longshore workers who were dispatched from a dispatch hall in Washington State to a job site from October 3, 2002 to the present. Dkt. No. 47 at 6. However, as the record establishes, this putative class covers a wide array of ports, terminals, job sites, dispatch halls, travel distances, employers, wait times, job assignments, routines, procedures and pay practices, some of which vary day by day, and all of which renders class treatment under Rule 23 inappropriate. The Court will describe below just some of the variations in travel distances, wait times, job

assignments, routines, procedures and pay practices at the terminals of the four largest ports in Washington.

Port of Seattle

The terminals at the Port of Seattle vary from half a mile to five and a half miles away from the dispatch hall. Dkt. No. 56, Ventoza Decl., ¶ 23. At Terminal 46, which is operated by the defendant entity formerly known as Marine Terminal Corp., semi-drivers arrive before the shift starts if they want to claim their preferred truck. Dkt. No. 51-6, Clay Decl., ¶ 6. The semi-drivers do not prep their vehicles, as this is performed by a mechanic. *Id.* Crane operators are on the job for four hours but are paid for ten and a half hours -- an extra hour and 15 minutes at both ends of the shift. *Id.*, ¶ 7. Top pick operators are paid one hour extra at both ends of their shift, as are gearmen. *Id.*, ¶¶ 8, 9. Registered clerks are paid one hour before they start, with the exception of hook checkers and nonregistered longshore workers, who are not paid an extra hour. *Id.*, ¶ 10. Slingmen and stevedores generally work only half their shift, but are paid for the full eight-hour shift. *Id.*, 12. If other longshore workers finish early, including semi-drivers, they are allowed to leave early and still receive pay for a full eight-hour shift. *Id.*, ¶ 13

At Terminal 18, which is operated by Defendant SSA Terminals, crane operators and top pick operators are paid an extra hour before and after their shift. Dkt. No. 51-8, Hunter Decl., ¶ 3. Semi-drivers may show up before their shift begins to claim a particular vehicle, but this is their choice. *Id.*, ¶ 5. Semi-drivers are required to look the vehicle over for any obvious problems, but they do not do any significant prep work. *Id.*, ¶ 6. Slingmen and lashers may arrive before or after the shift starts, depending on how long the dispatch process takes. *Id.*, ¶ 7. A bus takes longshore workers from the parking lot to the lunch room at the job site to muster, which takes about two minutes. *Id.* In general at the Port of Seattle, lashers who start work early (*i.e.*, are "flexed") work only until the cargo is unfastened but are still paid for a full eight-hour shift plus one extra hour. Dkt. No. 52, Weber Decl., ¶ 14.

However, longshore workers on the third shift of the day (known as the "hoot owl" shift), are only guaranteed five hours pay and are paid overtime at 1.8 times the hourly rate for hours worked in excess of five hours. Dkt. No. 56, Ventoza Decl., ¶ 29. Longshore workers on the first and second shifts of the day are paid overtime at 1.5 times the hourly rate for hours worked in excess of eight hours. *Id.* Some workers who finish early on their shift may choose to return to the dispatch hall to see if there is another job assignment available on a later shift. Dkt. No. 52, Weber Decl., ¶ 16.

At Terminal 5, operated by Defendant Eagle Marine Services, top pick and crane operators are paid an extra hour before their shift begins, although they are usually not at the terminal until after their shift's 7:00 a.m. start time. Dkt. No. 51-10, Pickles Decl., ¶ 4. Semi-drivers claim the semi they want and then drive it to the job site at "the tower," while other longshore workers will ride a shuttle. *Id.*, ¶¶ 5, 6. For "yard operations," the semi-drivers grab the semi they want and check in, but do not have to drive out to the tower as with ship operations. *Id.*, ¶ 8. For "dock/rail operations," the semi-drivers select the truck they want and then drive out to the job site, which takes about five to seven minutes. *Id.*, ¶ 9.

At Piers 30, 66 and 91, which are operated by Defendant SSA Marine, the longshore workers have historically provided stevedoring services in connection with cruise ships and occasional conventional cargo. The three piers vary in distance from the dispatch hall: Pier 30 is about two minutes away; Pier 66 is about ten minutes away; and Pier 91 is about twenty minutes away. Dkt. No. 51-11, Quinn Decl., ¶ 2. Some forklift operators will choose to pick their favorite forklift before the shift begins. *Id.*, ¶ 4. Crane operators must be ready to start work at 7:00 a.m., and they are paid for any prep time before then. *Id.*, ¶ 5. Porters report to their foreman at 7:00 a.m. *Id.*, ¶¶ 6, 7. If a porter arrives early and chooses to begin work, he or she will get a longer lunch break or rest break so he will be paid for any pre-shift work. *Id.* One forklift operator sets up a crew gangway before 7:00 a.m., but the operator is paid for a half-hour or an hour's work to do so. *Id.*, ¶ 8.

At Terminal 25, operated by Defendant SSA Terminals, longshore workers who work on the evening shift are paid until 3:00 a.m., even though the work typically ends around 1:00 or 2:00 a.m. Dkt. No. 51-12, Weisdepp Decl., ¶ 4. Semi-drivers may arrive before the shift begins, but that is only to select their preferred truck. *Id.*, ¶ 5. Other longshore workers are paid for any prep work performed before their shift begins. *Id.*, ¶ 8. In addition, the workers have a five minute walk or shuttle ride from the parking lot to the lunch room where they muster before their shift starts. *Id.*

In general at the Port of Seattle, what longshore workers do after they receive their job assignment at the dispatch hall and before their shift begins is their personal preference. Dkt. No. 56, Ventoza Decl., ¶¶ 27, 28. Some workers arrive early to the terminal and hang out, socialize and drink coffee, while others may arrive at the last moment before the shift starts. *Id.* Some workers may choose to claim and start up their preferred equipment before the shift begins, but that is not required. *Id.* Likewise, in Tacoma, some workers have enough time after they are dispatched to go get breakfast or coffee somewhere before heading to the terminal. Dkt. No. 57, Spell Decl., ¶ 22.

Port of Tacoma

The terminals at the Port of Tacoma vary from three to twelve minutes in distance by car from the dispatch hall. Dkt. No. 57, Spell Decl., ¶¶ 19, 20. At Terminal 4, operated by Defendant Husky Terminal and Stevedoring, operators of cranes, top picks and strads are paid an extra hour to cover prep work. Dkt. No. 51-4, Bassett Decl., ¶ 3. In contrast, semi-drivers do not have to do anything to get their truck ready before the shift begins. *Id.*, ¶ 4. In general in Tacoma, unlike in Seattle, workers are not allowed to claim their preferred equipment before the start of the shift. Dkt. No 57, Spell Decl., ¶¶ 21, 26. For a few select equipment jobs, workers may select their equipment beforehand, but they are already compensated for pre-shift prep time. *Id.*, ¶ 26. At Terminal 4, if a vessel is not in, regular longshore workers park in the employee lot near the terminal, and no buses or shuttles are used. Dkt. No. 51-4,

Bassett Decl., ¶ 5. If a vessel is in, however, they park in the overflow lot and a bus takes them from the lot to the ship, which takes about five minutes. *Id.*, ¶ 6. But the shuttle process does not take place until after the shift begins, so the workers are being paid for the travel time to the ship. *Id.*

At the container terminal in Tacoma operated by Defendant Washington United Terminals, top pick and reachstacker operators are paid an extra hour prior to shift time. Dkt. No. 51-5, Bynaker Decl., ¶ 3. Workers who are flexed start at 7:00 a.m. but are paid beginning at 6:00 a.m. *Id.* Hustler operators who arrive before the shift starts at 8:00 a.m. do so by choice so that they can pick out the truck they want. *Id.*, ¶¶ 7, 8. Housemen usually arrive about five minutes early to begin work at 8:00 a.m. *Id.*, ¶ 5. Crane operators working on a ship park in the nearby ship parking lot and begin work at 8:00 a.m. *Id.*, ¶ 6.

At APM Terminals, semi-drivers may grab their preferred semi before the shift begins or have a semi assigned to them by the foreman at 8:00 a.m. Dkt. No. 51-7, Cohen Decl., ¶ 3. The semi-drivers are not directed to perform any work or move their vehicle before 8:00 a.m. *Id.* In yard operations, semi-drivers on a call-back job use the same truck each day. However, they are not directed to start their vehicle before 8:00 a.m. *Id.*, ¶ 5. In the winter, a gearman will start up the trucks before the shift begins to warm them up. *Id.*, ¶ 6. Gearmen begin their shift at 6:00 a.m. *Id.* In addition, mechanics perform an inspection of the top picks and reachstackers before the start of the shift; accordingly, the operators need not do so. *Id.* In ship operations, even if the workers arrive early, they have a semi assigned to them by the foreman. *Id.*, ¶ 7. As with yard operations, they are not directed to start their vehicle before the shift commences at 8:00 a.m. *Id.*

At the Pierce County Terminal, operated by the defendant entity formerly known as Marine Terminal Corp., crane operators, strad drivers and side handlers are paid ten hours per day minimum, even though the shift is only eight hours. Dkt. No. 51-9, Miller Decl., ¶ 3. Strad drivers also do not do anything that could be characterized as pre-shift work. *Id.*, ¶ 11.

There is only one semi-driver at Pierce County Terminal, who starts at 7:00 a.m. and is paid for nine hours. *Id.*, ¶ 4. Each crane operator only works for four hours but is paid for ten hours. *Id.*, ¶ 7. Housemen are paid for 11 hours. *Id.*, ¶ 9. Pierce County Terminal has rail operations, and those workers are paid an extra hour on each side of their shift. *Id.*, ¶ 10. The entire rail operation is flexed, which means that the workers are paid for 11 hours. *Id.* Pierce County Terminal also has yard operations, which involves a high number of clerks who are paid beginning at 6:00 a.m., but do not start working until 7:00 a.m. *Id.*, ¶ 12. There is also a "roadability clerk," who is paid for either nine or ten hours depending on his or her seniority. *Id.*, ¶ 13.

In addition, the Port of Tacoma has Totem Ocean Trailer Express ("TOTE") operations, which uses semi trucks to drive cargo on and off specialized "roll-on/roll-off" ships that travel back and forth from Anchorage, Alaska. Dkt. No. 52, Weber Decl., ¶ 12. Semi drivers for TOTE operations are paid an extra hour to cover any prep time. *Id.*

At the Port of Tacoma, about 30% of the clerk positions are steady jobs, which means that the clerks work for a single employer on an ongoing basis and need not come to the dispatch hall each day. Dkt. No. 57, Spell Decl., ¶ 12. In addition, about 90% of the 180 mechanic positions in Tacoma are steady jobs, and 10 gearmen in Tacoma also work in steady positions. *Id.*

Port of Vancouver

In Vancouver, the dispatch hall is about two and a half to three miles from the port facilities, which takes three to five minutes to drive by car. Dkt. No. 58, Clark Decl., ¶ 5. Longshore workers park adjacent to the docks where they work. *Id.* Vancouver is not a container port, which means that the port does not rely on semis to move cargo, as with Seattle and Tacoma. Dkt. No. 52, Weber Decl., ¶ 11. The Port of Vancouver uses heavy forklifts whose operators are paid on an "eight-and-one" basis as a matter of practice, which means that they are paid an extra hour. *Id.* In addition, longshore workers in Vancouver who

operate equipment do not perform any prep work before the start of the shift. Dkt. No. 58, Clark Decl., ¶ 13. Any equipment inspections are performed after the shift begins. *Id.* Members of the local union in Vancouver are very disciplined about not commencing work before the start of the shift. *Id.* Workers who are dispatched early often use the time before the shift starts to run errands, make phone calls or socialize. *Id.*

There is significant variation at the Port of Vancouver regarding how and when workers are permitted to end work early. *Id.*, ¶ 15. It is not uncommon for workers to be released after four or five hours on the job, or for workers in a work gang to divide up duties so that half the gang works the first half of the shift, and is then relieved for the second half of the shift by the other gang. *Id.* The workers are still paid for their full shift despite finishing early. This results in the variation between the number of hours for which workers are paid, and the number of hours for which work is actually performed. *Id.*

In Vancouver, about 75% of the positions dispatched to Class A and Class B workers are call-back jobs, which means that the workers do not need to go to the dispatch hall before their shift begins. *Id.*, ¶ 10. Casual longshore workers are restricted to single-day assignments. *Id.* In Vancouver, there is broad variation from day to day in the number of workers who come to the dispatch hall seeking work, and the number of workers who bypass the dispatch hall and report directly to the job site. *Id.*

Port of Longview

In Longview, the dispatch hall is about three-quarters of a mile to two miles from the job sites at the port, which takes two to three minutes to drive by car. Dkt. No. 59, Norton Decl., ¶ 5. At the Port of Longview, longshore workers may start up equipment before the shift begins to claim their preferred equipment, but this is their choice. Dkt. No. 51-3, Abram Decl., ¶ 8. Longview is not a container port, which means that it does not use semis, as with Seattle and Tacoma. Dkt. No. 52, Weber Decl., ¶ 10. Log stacker operators come in early at 7:00 or 7:30 a.m. to get things ready, but they are already being paid at that time. Dkt. No.

51-3, Abram Decl., ¶ 9. Log stacker operators are paid an "eight-and-one," which means they are paid an extra hour to cover any prep work. Dkt. No. 52, Weber Decl., ¶ 10. At Longview, the longshore workers also unload windmills, which requires the use of heavy forklifts. *Id.*, ¶ 11. As with Vancouver, the heavy forklift operators at Longview are paid on an "eight-and-one" basis as a matter of practice. *Id.*

At Longview, longshore workers who are dispatched to flex jobs receive a nine hour guarantee, even though they generally do not work nine hours, and may work as few as four hours. Dkt. No. 59, Norton Decl., ¶ 10. Workers who operate equipment do not perform any pre-shift work to ready their equipment. *Id.*, ¶ 12. Any equipment inspection or other prep work is done after the shift begins. *Id.* It is common for workers who are dispatched early to go to breakfast, run errands, make phone calls or socialize before the shift begins. *Id.* In addition, it is common for workers to be released after only four or five hours of work, even though they are paid for the full eight hours or more. *Id.*, ¶ 14. Workers may also take long paid breaks of up to two to three hours. *Id.* There is considerable variation in when workers are released early, permitted to work split shifts, or to take long paid breaks. *Id.* As a result, there is wide variation between the hours for which workers are paid, and their actual hours of work. *Id.*

In Longview, the vast majority of Class A and B registered longshore workers work on call-back jobs, so they do not need to show up at the dispatch hall before going to the job site. Dkt. No. 59, Norton Decl., ¶ 8. As in Vancouver, casual workers are restricted to single day assignments. *Id.* In addition, steel jobs at Longview typically last two days, and jobs on log ships generally last six days. *Id.* In sum, there is significant variation from day to day in the number of workers who come to the dispatch hall seeking work, and the number of workers who bypass the dispatch hall. *Id.*

As described above, there is a multitude of individual variations in ports, terminals, job sites, travel distances, employers, wait times, job assignments, routines, procedures and pay

practices, among other things, several of which may vary day by day. There is simply no common method of class-wide proof, such as a standard course of conduct or practice, on which liability would turn. Instead, liability would turn on each longshore worker's individual story. The liability issue would require, at a bare minimum, an individualized inquiry into: the distance traveled from the dispatch hall to the terminal; the distance traveled from the terminal to the job site; how much time the worker had between dispatch and the shift start time; what the worker did during that time; how long the worker had to wait at the muster site for the shift to begin, if at all; what the worker's job assignment was and whether it required any pre-shift prep work; how much pre-shift work was performed, if any; how many hours was the worker paid for the particular job assignment; how many hours did the worker actually work; were the hours for which the worker was paid sufficient to cover pre-shift work, if any; were the hours for which the worker was paid sufficient to cover travel and wait time, if any, if compensable; and is the additional time for which the worker should be compensated, if any, considered *de minimis*. Moreover, for many if not most of the putative class members, the preceding individualized inquiries will vary day by day and week by week because the dispatch halls send longshore workers to different job assignments for different employers at various job sites. It is not enough for the named plaintiffs to testify as to their own individual stories, which will vary widely with all the putative class members whose experiences cover a broad range of ports, terminals, job sites, dispatch halls, travel distances, employers, wait times, job assignments, routines, procedures and pay practices.

In view of the foregoing, the conclusion is inescapable that individual issues would overwhelm any common issues. Indeed, as Mr. Lemon testified regarding pre-shift prep work, "Everyone is different, every situation is different." Dkt. No. 55, Lavitt Decl., Exh. B, Lemon Depo., pg. 98. While there are common legal questions in this action, the answers to those questions will not alone determine liability; liability can only be determined by a fact-intensive, individual analysis for each worker. For example, while it may be determined

under the applicable law that pre-shift prep time is compensable regardless of whether the worker chose to or was required to perform the work, there still must be an individualized inquiry -- often on a day by day basis -- to determine what the worker's job assignment was and whether it involved any pre-shift work; how much pre-shift work was performed, if any; how many hours was the worker paid for the particular job assignment (*e.g.*, was he or she paid on an "eight-and-one" or "8+2" basis); how many hours did the worker actually work (*e.g.*, did he or she only work five or six hours that day); were the hours for which the employee was paid sufficient to cover pre-shift work, if any; and is additional time for which the worker should be compensated, if any, *de minimis*.  The individualized inquiries on these factual issues will determine liability, not just the answers to the common legal questions.  Put another way, even if all the common legal questions are resolved in favor of Plaintiffs, Defendants can escape liability by demonstrating, on an individual basis, that workers were nonetheless paid for more hours than they worked or that any unpaid time is *de minimis*.  Indeed, the record establishes that, as a general proposition, many longshore workers are paid for more hours than they actually work, depending on an array of factors.  Because liability cannot be resolved by common questions, class treatment is inappropriate.  *See, e.g., Harper v. Sheriff*, 581 F.3d 511, 515 (7th Cir. 2009) ("Liability, to say nothing of damages, would need to be determined on an individual basis.  Thus, common issues do not predominate over individual issues, making this case inappropriate for class disposition."); *Rutstein v. Avis Rent-A-Car Systems*, 211 F.3d 1228, 1235-36 (11th Cir. 2000) ("Serious drawbacks to the maintenance of a class action are presented where initial determinations, such as the issue of liability *vel non*, turn upon highly individualized facts.") (citations and internal quotation marks omitted); *In re Northern Dist. of California, Dalkon Shield IUD Products Liability Litigation*, 693 F.2d 847, 856 (9th Cir. 1982) (in reversing district court, finding that the predominance requirement was not met, and noting that the trial court should have balanced the common factual questions against the greater number of individual questions relating to

liability); *Howard v. Gap, Inc.*, 2009 U.S. Dist. LEXIS 105196, at *13 (N.D. Cal. Oct. 29, 2009) ("There must be a common method of proof that tends to establish the required elements of liability as to all class members."); *Mateo v. V.F. Corp.*, 2009 U.S. Dist. LEXIS 105921, at *16-17 (N.D. Cal. Oct. 27, 2009) (noting that each putative class member would need to go through a seven-step factual inquiry with individualized proof to establish liability, and therefore finding that individual issues rather than common issues predominate); *Perez v. First American Title Ins. Co.*, 2009 U.S. Dist. LEXIS 75353, at *13 (D. Ariz. Aug. 12, 2009) ("If proof of liability would involve transaction-by-transaction analysis, then individual issues will predominate.  If, however, liability can be established on a class-wide basis, common issues will predominate . . . .").

Plaintiffs assert that the individual issues relate solely to damages, which would not be a proper basis for denying class certification. Dkt. No. 47 at 15; Dkt. No. 62 at 8; *see, e.g., Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment.").  While it is true that the Court would also need to examine many of these individual issues in order to calculate damages, these individual issues would nonetheless have to be addressed in the first instance in order to determine liability.  That is, the Court would not need to reach the individualized inquiries that would be necessary for damages until it first resolved the individual issues concerning liability.  *See Howard*, 2009 U.S. Dist. LEXIS 105196, at *15 ("[T]hese individual inquiries go to liability, not just damages.  Because individual liability inquiries will predominate, it is not necessary to delve into the many individualized inquires that would be necessary for damages.").  Only where common questions as to liability predominate will individual damages issues not defeat class treatment.  *See Mortimore v. FDIC*, 197 F.R.D. 432, 436 (W.D. Wash. 2000) ("The overwhelming weight of authority holds that the need for individual damages calculations does not diminish the appropriateness of class action certification *where common questions as to liability predominate.*") (emphasis added)

(internal citations and quotation marks omitted).  Because there is no class-wide proof that tends to establish whether Defendants are liable to all of the proposed class members, individual liability issues predominate over common issues and, consequently, this action is not suitable for adjudication on a representative basis.

### 2. Superiority

"Rule 23(b)(3) also requires that class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Hanlon*, 150 F.3d at 1023 (quoting FED. R. CIV. P. 23(b)(3)).  "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'" *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001).  As discussed above, each class member would have to litigate an assortment of separate factual issues in order to establish liability on the part of Defendants.  Accordingly, a class action is not a superior means of adjudicating these claims.

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion for Class Certification, Dkt No. 47, is DENIED.  Plaintiffs' claims are not typical and Plaintiffs cannot adequately represent the proposed class.  Furthermore, common issues do not predominate, and a class action is not the superior method for adjudicating these claims.  Although a class has not been certified, this action shall proceed as to Plaintiffs' individual claims.

DATED this 25th day of January, 2010.

James P. Donohue
_____
JAMES P. DONOHUE
United States Magistrate Judge