1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JAMES F. (JAY) LEVIAS and ANTHONY LEMON, individually and on behalf of a class of all similarly situated claimants,<br><br>    Plaintiffs,<br><br>v.<br><br>PACIFIC MARITIME ASSOCIATION; EAGLE MARINE SERVICES, INC.; MARINE TERMINALS CORPORATION; SSA TERMINALS, LLC; STEVEDORING SERVICES OF AMERICA, INC. (a/k/a SSA), SSA MARINE, INC., SSA TERMINALS, INC.; APM TERMINALS PACIFIC, LTD.; HUSKY TERMINAL AND STEVEDORING, INC.; PACIFIC CRANE MAINTENANCE COMPANY, L.P.; SEA STAR STEVEDORE COMPANY; and WASHINGTON UNITED TERMINALS,<br><br>    Defendants<br><br>  and<br><br>INTERNATIONAL LONGSHORE AND WAREHOUSE UNION,<br><br>    Intervenor-Defendant. | Case No. 08-cv-1610-JPD<br><br>ORDER GRANTING THE DEFENDANTS' AND INTERVENOR-DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT |

ORDER - 1

I.      INTRODUCTION AND SUMMARY CONCLUSION

Plaintiffs James Levias ("Levias") and Anthony Lemon ("Lemon") brought this suit against defendants Pacific Maritime Association ("PMA") as well as eleven PMA employer-members alleging that the defendants violated the Fair Labor Standards Act of 1938 ("FLSA"), as amended, 29 U.S.C. § 201 *et seq*., and the Washington Minimum Wage Act ("MWA"), Rev. Code Wash. § 49.46 *et seq*., by denying them compensation for travel time from the local union dispatch hall to the employer-member's terminals at the Port of Seattle, pre-shift time spent traveling from the port gate to the muster area and waiting for the shift to begin, and time spent performing pre-shift preparatory activities.  This matter comes before the Court on motions for summary judgment by PMA and intervenor-defendant International Longshore and Warehouse Union ("ILWU").  Dkts. 96 and 102.  Plaintiffs have filed a response opposing the motions, Dkts. 108, to which PMA and ILWU have replied, Dkts. 114 and 117.  Levias has also filed a surreply.  Dkt. 119.  For the reasons set forth below, PMA's and ILWU's summary judgment motions, Dkts. 96 and 102, are GRANTED.

II.     JURISDICTION

Pursuant to 28 U.S.C. § 636(c), the parties have consented to this matter proceeding before the undersigned United States Magistrate Judge.  *See* Dkt. 9; Dkt. 43.  The Court has general personal jurisdiction over the plaintiffs, who are both Washington residents.  *See* Dkt. 44 at 1.  The Court also has personal jurisdiction over PMA and the eleven employer-defendants in this action because the defendants have conducted substantial business in this jurisdiction, and the alleged cause of action arose out of the defendants' forum-related activities.  *See* Dkt. 34 at 1-3; Dkt. 45 at 2.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).  Venue is proper under 28 U.S.C. § 1391(b).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

III.   FACTS AND PROCEDURAL HISTORY

Defendant PMA is a multi-employer bargaining association representing approximately 70 employer-members in their dealings with ILWU and its locals.  PMA's employer-members are stevedoring and shipping companies and marine terminal operators at ports in California, Oregon and Washington.  The additional eleven defendants in this action are all PMA employer-members that have employed longshore workers and marine clerks in one or more of the eleven ports of Washington State.  ILWU is the exclusive bargaining representative of longshore workers and marine clerks who are employed by members of PMA, and work under the terms of the Pacific Coast Longshore and Clerks Agreement (the "PCLCA").  *See* Dkt. 13 at 2 (Sundet Decl.).  The PCLCA is the collective bargaining agreement governing longshore work on the West Coast.  It is comprised of two contract documents, the Pacific Coast Longshore Contract Document (the "PCLCD"), and the Pacific Coast Clerks Contract Document (the "PCCCD").  *See* Dkt. 13 at 3 (Sundet Decl.); Dkt. 56 at 2 (Ventoza Decl.).

Plaintiffs Levias and Lemon are longshore workers who are represented by ILWU Local 19, and primarily work at the Port of Seattle.[1]  Levias Dep. at 33.  Levias is a Class B registered longshore worker who, with rare exceptions, has been dispatched to Seattle jobs for PMA employer-members SSA Terminals, Inc. ("SSAT"), Eagle Marine ("Eagle"), and Marine Terminals Corporation ("MTC").  *Id*.  Specifically, Levias has done top pick work, "a lot of lashing, a little bit of stevedore, but the majority is driving semi[-trucks]."  *Id*. at 12, 33.  Lemon is a Class A registered longshore worker primarily dispatched to work for SSAT.  Lemon Dep. at 46-47, 122.  Lemon has occasionally worked as a dockman, heavy bull

---

[1] PMA asserts that in the three years immediately preceding this lawsuit, Lemon worked approximately 1,300 shifts in Seattle, and eight shifts in Tacoma.  Similarly, since Levias' return to the industry in September 2009, he has worked approximately 750 shifts in Seattle, two shifts in Tacoma, and three shifts in Vancouver.  Plaintiffs were paid additional "inter-portal travel pay" on the days when they worked in Tacoma or Vancouver.  *See* Dkt. 96 at 4; Dkt. 52 at 7 (Weber Decl.); *id*., Ex. G (plaintiffs' work records).

ORDER - 3

operator, or foreman, but typically works as a top pick handler.  *Id*. at 108-10, 112, 118-19, 127.

Available longshore work is uneven and not guaranteed, and depends on variables such as the number of ships in port and the amount of cargo to be loaded or unloaded.  Each day that plaintiffs and all other longshore workers want to work, they must first go to one of the twelve ILWU dispatch halls used for assigning longshore workers to the eleven ports in Washington.[2]  Dkt. 56 at 5 (Ventoza Decl.).  The dispatch hall that plaintiffs report to in Seattle is the ILWU Local 19 dispatch hall (the "Local 19 dispatch hall").  The dispatchers at the Local 19 dispatch hall use a peg board system to fairly distribute available work opportunities.[3]  *See id.* at 6.  Class A registered longshore workers, such as Lemon, enjoy first preference in selecting available jobs, followed by Class B registered longshore workers, such as Levias.  *See id.*; Levias Dep. at 21.  If additional workers are needed beyond the Class A and B registered longshore workers, then identified casuals and unidentified casuals are offered the remaining work, in that order.  *See* Dkt. 56 at 6 (Ventoza Decl.).

The dispatcher typically issues one dispatch slip listing the names of all the longshoremen assigned to a particular worksite, and asks one longshore worker assigned to that worksite to take the dispatch slip to the foreman.[4]  Following dispatch, plaintiffs "have to report at a certain time . . . at the worksite at the Port."  Dkt. 120 at 2 (Levias Decl.).

---

[2] The exceptions are those longshore workers who obtain a steady job working for a single employer on an ongoing basis, and those who work a multi-day job or a call-back job.  During those days the longshoreman reports directly to the employer's terminal.  *See* Lemon Dep. at 50.  Plaintiffs are not seeking compensation for pre-shift time on days when they have worked multi-day or call-back jobs.

[3] Specifically, each day the dispatchers write the names of the ships currently docked at the different Seattle terminals and the available work on a large white dry board behind a clear window listing the names of each Class A registered longshoreman.  When an A-registered worker shows up at the hall, he places a small wood peg in the dispatch window beside his name to indicate that he is present.  There is a similar set up for Class B registered longshoremen.  This peg-board system enables the dispatcher to resume where he left off on the names from the previous day.  *See* Dkt. 56 at 5-6 (Ventoza Decl.).

[4] Although the parties initially disagreed regarding the function of dispatch slips, plaintiffs appear to have conceded that ILWU accurately described this process, which is referred to as "carrying

Longshore workers then travel variable distances to their assigned port terminal. Levias and Lemon testified that the "three to four mile" drive from the Local 19 dispatch hall to Terminal 18, where SSAT is located, could take between seven to twenty minutes "because of the trains or a bridge could be open or you could get football traffic." Levias Dep. at 34-36; Lemon Dep. at 61. Although there is no evidence in the record regarding the length of the drive from the Local 19 dispatch hall to Eagle, the drive to MTC takes "just a few minutes." Levias Dep. at 52. When plaintiffs arrive at their terminal, they must show identification to "badge through" the port gate. *Id*. at 53. After parking in the terminal parking lot, plaintiffs typically don their safety vests, hard hats, and hard-toed boots. *See id*. at 38-39. Overalls are optional. *See* Dkt. 92 at 2 (Stearns Decl.).

If longshore workers will be operating equipment, such as a semi-truck or forklift, they are not assigned to a particular piece of equipment but generally can choose the equipment they prefer to operate on a first-come-first-serve basis. *See* Levias Dep. at 109, 126; Lemon Dep. at 37-38. As a result, plaintiffs typically walk from the parking lot to the fueling area in order to select their preferred equipment. *See* Levias Dep. at 38. Plaintiffs are required to perform a brief safety check before operating the equipment, which takes anywhere from "thirty seconds or so" to "just a couple minutes." *Id.* at 109, 125-26; Lemon Dep. at 37-38. This safety check involves visually inspecting the hydraulic hoses or air hoses, safety belts, mirrors, and making sure there are no flat tires and the backup alert is working. *See* Levias Dep. at 41, 137-38. Mechanics, rather than plaintiffs, are responsible for actually maintaining the equipment. *Id*. at 46. After performing the safety check, plaintiffs "make [their] way to the break room," typically by driving their equipment to the muster area, where the foreman will give a safety speech that marks the beginning of the shift. *Id*. at 38; Lemon Dep. at 125. Plaintiffs have occasionally gone straight from the parking lot to the muster area, and have

---

the mail." Dkt. 56 at 8 (Ventoza Decl.); *id*., Ex. B (example of a dispatch slip). *See also* Dkt. 108 at 12; Dkt. 115 at 2 (Weber Reply Decl.); Dkt. 120 at 2 (Levias Decl.).

ORDER - 5

1   selected their equipment and performed the required safety check after the beginning of their

2   shift.  Lemon Dep. at 127.  Similarly, if plaintiffs will not be operating equipment on a

3   particular day, they take a bus or shuttle directly from the parking lot to the muster area.

4   Levias Dep. at 47, 54-55.

5        At the muster area, plaintiffs locate and sign in with the foreman, receive their work

6   assignment for the day, and wait for the foreman's safety speech to signal the beginning of the

7   shift.  *See id*. at 47-48.   While waiting for the shift to start, plaintiffs can socialize, drink

8   coffee, "read newspapers or the foreman sometimes might give you other directions . . . You

9   never know what's going to happen." *See id*. at 56.  According to plaintiffs, the entire process

10  of arriving at the terminal parking lot, walking to the fueling area, selecting equipment,

11  performing the required safety check, traveling to the muster area, and reporting to the foreman

12  can take plaintiffs between five to twenty minutes.  *See id*. at 66-69.

13       Levias filed this action in the King County Superior Court on October 6, 2008, alleging

14  violations of the MWA on behalf of himself and as a putative representative of a class

15  consisting of "all longshore workers who appeared at and were dispatched from any dispatch

16  hall in the state of Washington to any job for PMA and its members during the time period

17  from October 3, 2002 to present," and who were not compensated for pre-shift work including

18  travel time from the dispatch hall to the jobsite, wait time at the job site, and pre-shift

19  preparation time.  Dkt. 5, Att. 1 at 9.  Defendants removed the action to federal court.  Dkt. 1.

20  On February 19, 2009, Levias filed a stipulated motion to dismiss as to certain defendants as

21  well as add other defendants to his original complaint.  Dkt. 14.  On March 5, 2009, the

22  ILWU was permitted to intervene as an intervenor-defendant.  Dkt. 15.  Levias then filed a

23  first and second amended complaint which named the new defendants, added Lemon as the

24  second plaintiff in this action, and added new claims for violation of the FLSA.  Dkt. 16; Dkt.

25  44.  Plaintiffs moved for certification of the class, which was denied by this Court on January

26

25, 2010.  Dkt. 47 at 6; Dkt. 73.  Thus, this action currently proceeds only as to the individual

claims of plaintiffs Levias and Lemon.  Dkt. 96; Dkt. 102.

Plaintiffs contend that the Local 19 dispatch hall in Seattle constitutes a "worksite"

where they are "hired by PMA members . . . [because the hall] is jointly leased, operated and

controlled by the employers and union through the local joint labor relations committee."

Dkt. 108 at 9, 11, 14.  As a result, plaintiffs allege that the pre-shift travel, wait and

preparation time was primarily for the benefit and convenience of PMA's employer-members,

and therefore constitutes compensable "hours worked" under the FLSA, as amended, 29

U.S.C. § 201 *et seq.*, and the Washington MWA, RCW § 49.46 *et seq.  See id.* at 5.

Specifically, plaintiffs seek compensation for (1) travel time from the Local 19 dispatch hall

to the employer's terminals at the Port of Seattle; (2) travel time while plaintiffs "badge

through" the port gate, ride or walk from the employer-member's parking lot to the muster

area, and wait for the shift to begin; and (3) time spent performing pre-shift preparatory

activities, such as donning safety gear, selecting equipment, and performing the required

equipment safety check.  *See id.* at 5, 12.

IV.     DISCUSSION

A.     Legal Standards

1.     *Summary Judgment Standard*

Summary judgment "shall be entered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  An issue of fact is "genuine" if it constitutes evidence

with which "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  That genuine issue of fact is "material" if it

"might affect the outcome of the suit under the governing law."  *Id.*

1    When applying these standards, the Court must view the evidence and draw reasonable

2    inferences therefrom in the light most favorable to the non-moving party.  *See United States v.*

3    *Johnson Controls, Inc*., 457 F.3d 1009, 1013 (9th Cir. 2006).  The moving party can carry its

4    initial burden by producing evidence that negates an essential element of the nonmoving

5    party's claim, or by establishing that the nonmoving party does not have enough evidence of an

6    essential element to satisfy its burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co. v.*

7    *Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000).

8    Once this has occurred, the procedural burden shifts to the party opposing summary

9    judgment, who must go beyond the pleadings and affirmatively establish a genuine issue on the

10    merits of the case.  Fed. R. Civ. P. 56(e).  The nonmovant must do more than simply deny the

11    veracity of everything offered by the moving party or show a mere "metaphysical doubt as to

12    the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586

13    (1986). The mere existence of a scintilla of evidence in support of the plaintiff's position is

14    likewise insufficient to create a genuine factual dispute.  *Anderson*, 477 U.S. at 252.  To avoid

15    summary judgment, the nonmoving party must, in the words of Rule 56, "set forth specific

16    facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The nonmoving

17    party's failure of proof concerning an essential element of its case necessarily "renders all

18    other facts immaterial," creating no genuine issue of fact and thereby entitling the moving

19    party to summary judgment.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986).

20                    2.    *The FLSA, as Amended by the Portal-to-Portal Act*

21    The FLSA requires that employers pay employees for all "hours worked."  29 U.S.C.

22    § 206, 207(a)(1).  Whether an activity is excluded from "hours worked" under the FLSA is a

23    mixed question of law and fact.  The nature of employees' duties is a question of fact, and the

24    application of the FLSA to those duties is a question of law.  *See Ballaris v. Wacker Siltronic*

25    *Corp*., 370 F.3d 901, 910 (9th Cir. 2004).  Where there is no dispute over the nature of the

26    employees' activities involved, the question is one of law.  *See id*.

ORDER - 8

1   Although the FLSA does not clearly define what types of activity qualify as "hours

2   worked," the Supreme Court has decided several cases in which it elaborated on the types of

3   activities that are compensable work under the FLSA.  In *Tennessee Coal, Iron & R.R. v.*

4   *Muscoda Local No. 123*, the Supreme Court held that work is "physical or mental exertion

5   (whether burdensome or not) controlled or required by the employer and pursued necessarily

6   and primarily for the benefit of the employer and his business."  321 U.S. 590, 598 (1944).  *See*

7   *also Jewell Ridge Coal Corp. v. Local No. 6167*, 325 U.S. 161, 164-65 (1945).  The Supreme

8   Court has also defined work as including an employee's non-exertional acts in some

9   circumstances.  *See Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944) (providing that

10   exertion is not the *sine qua non* of work because "an employer . . . may hire a man to do

11   nothing, or to do nothing but wait for something to happen.  Refraining from other activity

12   often is a factor of instant readiness to serve[.]").  Thus, an employee's activities, whether or

13   not they are exertional or burdensome, constitute work under the FLSA if they are "pursued

14   necessarily and primarily for the benefits of the employer."  *Muscoda*, 321 U.S. at 598.

15   Once it has been established that an activity constitutes work, a plaintiff must show that

16   the activity is compensable under the Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251-62, which

17   amended the FLSA by narrowing the definition of work following the Supreme Court's

18   decision in *Anderson v. Mount Clemens Pottery Co*., 328 U.S. 680, 690-91 (1946) (broadly

19   construing "hours worked" under the FLSA).  The Portal-to-Portal Act provides that certain

20   preliminary and after work activities are noncompensable:

21
22   (1) walking, riding, or traveling to and from the actual place of
     performance of the principal activity or activities which such
23   employee is employed to perform, and

24   (2) activities which are preliminary to or postliminary to said
     principal activity or activities,

25   which occur either prior to the time on any particular workday at
26   which such employee commences, or subsequent to the time on

any particular workday at which he ceases, such principal activity or activities. . . .

29 U.S.C. § 254(a).

In 1956, the Supreme Court carved an exception to the Portal-to-Portal Act in *Steiner v. Mitchell* to ensure that not all "preliminary or postliminary" activities can go uncompensated. 350 U.S. 247, 249 (1956) (holding that battery plant workers who were compelled to change their clothes before and after work and to shower in facilities provided by the employer were entitled to compensation for these activities under the Portal-to-Portal Act). Specifically, *Steiner* held that "activities performed either before or after the regular work shift" are compensable despite the Portal-to-Portal Act "if those activities are an integral and indispensable part of the principal activities . . . and are not specifically excluded by Section 4(a)(1)."[5] *Id*. at 256 (referring to 29 U.S.C. § 254(a)(1), which defines commuting time between home and work as noncompensable). The Department of Labor ("DOL") has explained that an activity is "an integral part of a principal activity" if it is a "closely related" activity that is "indispensable to its performance." 29 C.F.R. § 790.8(c). *See also Bamonte v. City of Mesa*, 598 F.3d 1217, 1223 (9th Cir. 2010) (providing that the DOL's policy statements are not entitled to deference, but are "entitled to respect . . . to the extent that they have the power to persuade.") (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)).

Finally, the Supreme Court in *Anderson* articulated a *de minimis* doctrine which remained undisturbed by the passage of the Portal-to-Portal Act. *See Carter v. Panama Canal Company*, 314 F. Supp. 386, 392 (D.D.C. 1970) (observing that the "section of the opinion [in *Anderson* discussing the *de minimis* rule] was not considered when Congress enacted the

---

[5] However, once a preliminary activity that is integral and indispensable to the work is commenced, any activity occurring thereafter in the scope and course of employment is compensable pursuant to the continuous workday rule. *See Alvarez v. IBP, Inc*., 339 F.3d 894, 902 (9th Cir. 2003) (noting that § 254(a)(1) is not a "stand alone" provision). In other words, under the "continuous workday rule, if plaintiffs establish that they are entitled to compensation for time spent performing a preliminary or preparatory activity, they are also entitled to compensation for any activities performed thereafter, including "walking, riding, or traveling to . . . the actual place of performance" of the principal activity. *See id*. at 906-07.

1   Portal-to-Portal Act and remains the rule today."). The *de minimis* doctrine provides that, even

2   if certain activities are otherwise compensable under the FLSA, these activities are

3   noncompensable if they involve an "insubstantial and insignificant" amount of time because

4   the FLSA does not compensate "a few seconds or minutes or work beyond the scheduled

5   working hours." *Anderson*, 328 U.S. at 692-93. The Ninth Circuit has held that in determining

6   whether an otherwise compensable time is *de minimis* under *Anderson*, courts should consider

7   "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate

8   amount of compensable time; and (3) the regularity of the additional work." *Lindow v. United*

9   *States*, 738 F.2d 1057, 1063 (9th Cir. 1984).

10          The Ninth Circuit has summarized the process for determining whether an activity

11   constitutes compensable work under the FLSA and its related jurisprudence as a "three-stage

12   inquiry." *Bamonte*, 598 F.3d at 1224. First, a court must consider whether an activity

13   constitutes work under the FLSA, because it involves "physical or mental exertion . . .

14   controlled or required by the employer and pursued necessarily and primarily for the benefit of

15   the employer." *See id*. at 1225. Second, a court must consider whether the preliminary or

16   postliminary activity is "integral and indispensable" to the principal activities for which the

17   employees are employed. *See id.*; *see also Steiner*, 350 U.S. at 256. Finally, a court must

18   consider whether the time involved is *de minimis*. *See Bamonte*, 598 F.3d at 1224; *Lindow*,

19   738 F.2d at 1063.

20                        3.     *The Washington MWA*

21          The MWA provides that employees are entitled to compensation for regular hours

22   worked and any overtime hours worked. *See* RCW § 49.46.0120, RCW § 49.46.130; *Bostain*

23   *v. Food Express, Inc*., 159 Wash.2d 700, 708-09 (2007). Moreover, where an employer has

24   "willfully" withheld wages in violation of the MWA, RCW § 49.52 allows aggrieved

25   employees to recover double damages. Although the legislature has not defined "hours

26   worked" under the MWA, Wash. Admin. Code § 296-126-002(8) defines "hours worked" as

ORDER - 11

1   "all hours during which the employee is authorized or required by the employer to be on duty

2   on the employer's premises or at a prescribed work place." WAC § 296-126-002(8). The

3   Washington Supreme Court has held that WAC § 296-126-002(8) provides "the appropriate

4   standard" under the MWA. *Stevens v. Brink's Home Security, Inc.*, 162 Wash.2d 42, 47 & n.1

5   (2007). Furthermore, because the MWA was modeled after the FLSA, it is construed

6   according to FLSA authority except where state law expressly differs. *See Webster v. Public*

7   *School Employees of Washington, Inc.*, 247 F.3d 910, 918 (9th Cir. 2001); *Champagne v.*

8   *Thurston County*, 163 Wash.2d 69, 87 (2008).

9                     B.    Effect of the Parties' Agreements

10   ILWU and PMA contend that the parties' agreements provide persuasive evidence that

11   the Local 19 dispatch hall is not a "worksite" where the plaintiffs are hired, and that the pre-

12   shift activities at issue are not compensable work. *See* Dkt. 102 at 7-14; Dkt. 96 at 17-18.

13   Specifically, ILWU argues that the parties' collective bargaining agreement, the PCLCA,

14   provides that compensable longshore work begins once the workers are "turned to" by the

15   PMA employer-members at the contract shift start, and not at the time of dispatch, as alleged

16   by plaintiffs. *See* Dkt. 102 at 10. In addition, ILWU asserts that with one exception for "flex

17   starts," as defined in the PCLCA, longshoremen's workday begins with the official shift start.

18   Finally, ILWU argues that "plaintiffs, by their own conduct, have constructively concurred

19   with and directly benefited from this arrangement . . . it is undisputed that neither [plaintiff]

20   has ever filed a grievance over the Parties' longstanding, contractual definition of compensable

21   work. Plaintiffs' long acquiescence constitutes a constructive agreement[.]" Dkt. 102 at 12.

22   Plaintiffs respond that the PCLCA does not specifically discuss the compensability of the pre-

23   shift activities at issue. Dkt. 108 at 16.

24   Employees' rights under the FLSA "cannot be abridged by contract or otherwise

25   waived." *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 740 (1981). The

26   Ninth Circuit has emphasized, however, that "[a]lthough the existence of an agreement

1    [between the parties] may not be controlling in all cases, it is usually relevant to the

2    compensability issue." *See Owens v. Local No. 169, Ass'n of Western Pulp and Paper*

3    *Workers*, 971 F.2d 347, 354 (9th Cir. 1992).  Specifically, the Ninth Circuit observed in *Owens*

4    that an inquiry into the agreement between the parties involves "scrutiny and construction of

5    the agreements between the particular parties [and] appraisal of their practical construction of

6    the working agreement by conduct[.]" *Id.* at 354.  Similarly, in *Berry v. County of Sonoma*, the

7    Ninth Circuit held that the parties' collective bargaining agreements are a "predominant" but

8    not "controlling" factor to be considered in determining whether the parties intended to define

9    an activity as work.  30 F.3d 1174, 1181 (9th Cir. 1994) (holding that "[a] constructive

10   agreement may arise if employees have been informed of the . . . compensation policy and

11   continue to work under the disclosed terms of the policy.").  *See also Chelan County Deputy*

12   *Sheriffs' Ass'n  v. County of Chelan*, 109 Wash.2d 282, 292-93 (1987) (providing that the

13   parties' characterization of time is relevant to the judicial determination whether the time is

14   compensable under the MWA).

15         The Court agrees with ILWU that the terms of the collective bargaining agreement

16   weigh against a conclusion that the pre-shift activities at issue constitute compensable work.

17   *See Berry*, 30 F.3d at 1182.  The PCLCA does not contain any provision indicating that

18   plaintiffs have been hired – and therefore have a right to compensation - as soon as they have

19   been dispatched from the hall.  To the contrary, section 3.1 of the PCLCD provides that Class

20   A and B registered longshore workers are guaranteed eight hours of pay, regardless of the

21   actual number of hours the longshore worker may work up to eight, as soon as they "are

22   ordered to a job and . . . *report to work* and are *turned to*."  Dkt. 103, Ex. A at 16-17 (§ 3.1 of

23   the PCLCD) (emphasis added); *id*. at 3 (Sundet Decl.).  Similarly, section 3.1211 expressly

24   provides that longshore workers are not entitled to the eight-hour guarantee of pay "when men

25   are neither turned to nor ordered to stand by" at the jobsite.  *Id*., Ex. A at 17 (§ 3.1211 of the

26   PCLCD).  Moreover, the PCLCA establishes three shifts, with "start times" of 8:00 a.m., 6:00

ORDER - 13

p.m., or 3:00 a.m.  *Id.* at 14.  Early starts of one-hour, called "flex starts," are permitted in limited circumstances for the performance of certain dock operations, and "flexed" workers are paid overtime compensation.  *Id*. at 15 (§ 2.449 of the PCLCD).  *See also* Dkt. 56 at 11-12 (Ventoza Decl.); Dkt. 103 at 3 (Sundet Decl.).

In light of plaintiffs' long-term compliance with the negotiated terms of the PCLCA, the Court is persuaded that the parties did not intend for the pre-shift activities at issue to constitute compensable work.  *See Berry*, 30 F.3d at 1180; *Owens*, 971 F.2d at 355.  The corollary to the contract provisions discussed above is that, with the exception of "flex starts," plaintiffs are hired by PMA's employer-members when they are "turned to" at the jobsite at the contractual start of their shift, and not when they are dispatched.  Because the parties' agreements are not a controlling consideration, however, the Court must also consider whether these pre-shift activities constitute compensable work under the FLSA or MWA.

C. <u>The Dispatch Hall Is Not a "Worksite" Where Plaintiffs Are Hired</u>

Plaintiffs contend that the Local 19 dispatch hall constitutes a "worksite" because it is the premises "where the employer hires the employee and . . . is at least jointly owned and/or leased, run and operated by the employers."  Dkt. 108 at 14.  In support of this argument, plaintiffs point to undisputed facts regarding the joint operation of the dispatch hall by ILWU and PMA: the Local 19 dispatch hall is jointly leased by PMA and ILWU; PMA and ILWU have negotiated uniform rules for dispatching workers to all ports on the west coast through the Joint Coast Labor Relations Committee; PMA is contractually entitled to have a PMA representative present at the hall during dispatch operations; and the employer-members, through PMA, ultimately pay the costs of operating the halls, including the salaries of the dispatchers and longshoremen.[6]  *See* Dkt. 108 at 4-5, 11; Dkt. 119 at 3; Dkt. 120 at 1 (Levias Decl.).  Levias also asserts in his declaration that "I and all other workers I know of are only

---

[6] PMA does not dispute these facts, including its contractual right "to have observers present during dispatch, [although] this is an infrequently exercised right."  Dkt. 52 at 3 (Weber Decl.).

hired at the dispatch hall . . . Once we have been hired at the dispatch hall, we then report to the employer who hired us at the Port.  No one to my knowledge, including me, has ever called the hall after dispatch to a particular employer and told them to send someone else instead."  Dkt. 120 at 1 (Levias Decl.).  In other words, plaintiffs allege that there is a genuine issue of material fact in this case as to "whether the dispatch hall, where Plaintiffs were hired . . . was jointly owned, operated and controlled by the employer and should be considered part of the premise of the employer."  Dkt. 108 at 22.

Plaintiffs' arguments are not persuasive.  It is undisputed that to some degree, ILWU and PMA jointly operate the dispatch halls.  However, plaintiffs have not provided any evidence, or cited any authority, to support their argument that simply by virtue of this joint operation, the Local 19 dispatch hall constitutes a PMA employer-member controlled "worksite."  For example, plaintiffs do not assert and have not presented any evidence that plaintiffs actually perform any work at the hall, or that PMA's employer-members exert any control over the way plaintiffs spend their time at the hall.  Dkt. 56 at 8 (Ventoza Decl.).  Indeed, the evidence of record demonstrates just the opposite.

Significantly, Lemon testified that he does not consider the Local 19 dispatch hall a "job site."  Levias Dep. at 79.  Longshore workers at the Local 19 dispatch hall "play cards or will discuss, you know, things that came up on other shifts or – that's kind of how we discuss work stuff, like meeting minutes or the stuff that happened in previous meetings or stuff at work."  Levias Dep. at 21.  Occasionally, Lemon goes to the Local 19 dispatch hall on days when he has a callback job to socialize with the other longshore workers.  Lemon Dep. at 50.  Typically, Lemon spends his time at the hall "sitting back drinking coffee."  Lemon Dep. at 42.  He explained that on most days,

> I just like sitting back observing the hall.  There's a vibe in the hall.  I just sit back and watch people, that's all.  It's a hell of a place.  You learn a lot of things just sitting back watching what's going on in the hall. . . . You just - - I mean, this is a place where,

1
2

> you know, different people get together.  Some people I would
> never associate with in my whole life except at the hall.  It's a
> unique place.

3   Lemon Dep. at 49-50.

4          Consistent with Lemon's testimony, ILWU asserts that far from constituting a

5   "worksite," the dispatch halls are an integral part of the union's culture and a "safe harbor" for

6   longshore workers from management and employers where longshoremen can socialize and

7   commiserate.  *See id*. at 8.  ILWU has proffered evidence that traces the historical

8   development of the dispatch hall and the importance of the dispatch hall to the Union.  ILWU

9   avers that the creation and maintenance of the joint dispatch halls to fairly and equitably

10  distribute available longshore work has served as a bulwark against the cronyism and

11  favoritism that historically controlled the distribution of longshore work at the ports on the

12  West Coast.  Dkt. 11; Dkt. 56 at 6 (Ventoza Decl.).  ILWU explains that "the PMA Employers

13  lost control over the dispatching of longshore jobs assignments many decades ago and, despite

14  continuous efforts, have been unable to reclaim control . . . [As a result, there] arose a fair and

15  equitable system of distributing work opportunities under Union membership control, known

16  today as the 'joint' dispatch hall system."  Dkt. 13 at 3-4 (Sundet Decl.).

17         Specifically, in response to the "Big Strike," a coastwide longshore strike initiated on

18  May 9, 1934, President Roosevelt appointed a National Longshore Board that established the

19  joint dispatch halls – over the strong objection of employers - through an October 12, 1934

20  arbitration award.  *Id*. at 4.  The 1934 award ordered the employers and union to establish a

21  joint labor relations committee in each port responsible for operating joint dispatch halls, and

22  establishing and maintaining "registered lists" of longshoremen eligible for dispatch to

23  available jobs in the port.  *Id*. at 4-5.  *See also Shipowners' Association of the Pacific Coast*, 7

24  NLRB 1002, 1009-10 (1938) (summarizing the history of the "Big Strike," ILWU,

25  employers' associations, and the origins of the union dispatch halls).  In February 1937, an

26  agreement was reached that effectively amended the award to provide that the hiring of all

longshoremen had to go through dispatch halls maintained jointly by the union and the employers' associations, and that the actual dispatcher must be selected by the union. *See id.* at 1009. Significantly, "the Board's award gave the ILWU membership the right to elect the dispatchers, and so effectively control the dispatch hall operations." Dkt. 13 at 5 (Sundet Decl.) ("One of the main reasons the ILWU has always insisted on Union and member control over dispatch is the memory of the 'shape up,' when workers had to grovel and beg for work and were under the control of the employers even before the shift began . . . Union control over dispatch – through the dispatch hall with its democratically-elected rank-and-file dispatchers – ensures that dispatch proceeds in a non-arbitrary and fair way. It also ensures that workers' time before the official start of the shift . . . is entirely their own and is totally free from employer domination or interference."). The union-member dispatchers, "who are elected by the local union members, identify and send labor to fill the job orders that have been placed by the stevedoring companies and terminal operators for that day." Dkt. 52 at 3 (Weber Decl.); *id.*, Ex. A § 8 (provision of the PCLCD covering dispatch). Since 1937, "the ILWU and PMA have negotiated successive collective-bargaining agreements that have continuously included provisions for the joint registration/dispatch system originally mandated by the National Longshore Board," in order to maintain union control over the hiring process. *Id.*

In light of the substantial evidence regarding the origins and function of the dispatch halls provided by ILWU, as well as the parties' agreements discussed *supra*, plaintiffs' bare assertion that they consider themselves to have been "hired" by PMA's employer-members at the dispatch hall does not present a genuine issue of material fact on this issue. *See Zenith Radio Corp.*, 475 U.S. at 586 (nonmovant must do more than simply deny the veracity of everything offered by the moving party or show a mere "metaphysical doubt as to the material facts."). Although Levias is unaware of any time in which an employee "called the hall after dispatch to a particular employer and told them to send someone else instead," plaintiffs do

not allege that they are required to accept any jobs they do not wish to accept.  *See* Dkt. 120 at

1 (Levias Decl.).  Accordingly, plaintiffs have failed to present a genuine issue of material

fact regarding whether the Local 19 dispatch hall constitutes a "worksite" controlled by

PMA's employer-members.  Based upon record before this Court, it does not.[7]

D.   Travel Time from the Dispatch Hall to the Job Site Is Not Compensable

1.   *Plaintiffs are Not Entitled to Compensation under the FLSA*

Plaintiffs seek compensation for travel time from the Local 19 dispatch hall to the job

site.  *See* Dkt. 108 at 14.  Specifically, plaintiffs allege that their travel from the dispatch hall to

the job site is distinguishable from ordinary home-to-work travel, because the "employers have

made travel from the dispatch hall to the job site an integral part of the job, because an

employee cannot be hired into a job without going to the hall at the insistence of the employer

. . . travel that is made essential by the employer is compensable."  Dkt. 108 at 14-15 (citing

*Gilmer v. Alameda-Contra Costa Transit Dist.*  2010 WL 289299, *6 (N.D. Cal. 2010)

(holding that bus drivers are entitled to compensation under the FLSA for time spent returning

to the starting point of their route before beginning their commute home, because "plaintiffs do

not voluntarily choose to end their runs at a different location from where they began.")).  In

other words, plaintiffs allege that because the Local 19 dispatch hall is a PMA-controlled

"worksite" to which plaintiffs must travel to be "hired" for the day, their travel from the

dispatch hall to the employers' worksites is involuntary and solely benefits the employer.  Dkt.

108 at 7-8.

---

[7] Even assuming that the dispatch process at the Local 19 dispatch hall is "controlled" by PMA, this would not negate the Court's conclusion, discussed below, that plaintiffs are not entitled to compensation under the FLSA and MWA for the pre-shift activities at issue in this case.  *See Bernal v. Trueblue, Inc*., 2010 WL 2599762 (W.D. Mich. 2010) (denying employees' claims for compensation under the FLSA for time spent waiting to start an assignment in the employer-owned and operated dispatch hall, travel time from the employer's dispatch hall to the customer's location, and travel time back to the employer's dispatch hall).

1    As discussed above, an employee's activities, whether or not they are exertional or

2    burdensome, constitute work under the FLSA if they are "pursued necessarily and primarily for

3    the benefits of the employer." *Muscoda*, 321 U.S. at 598.  However, under the Portal-to-Portal

4    Act, 29 U.S.C. § 254(a), employers are only required to compensate employees  for time spent

5    engaging in preliminary or postliminary activities that are "an integral and indispensable part

6    of the principal activities . . . and are not specifically excluded by Section 4(a)(1)."  *Steiner*,

7    350 U.S. at 256.  Moreover, Congress amended the Portal-to-Portal Act with the Employment

8    Commuter Flexibility Act ("EFCA") in 1996, which provides that "walking, riding, or

9    traveling to and from the actual place of performance of the principal activity or activities

10   which [an] employee is required to perform" is not compensable.  29 U.S.C. § 254(a)(1).  *See*

11   *also* 29 C.F.R. § 785.35 ("Normal travel from home to work is not worktime."); *id.* § 790.7(f);

12   *Rutti v. Lojack Corp.*, 596 F.3d 1046, 1051-51 (9th Cir. 2010) (reviewing legislative history).

13   Thus, the general rule is that travel is not considered a principal activity of employment

14   unless it is an indispensable part of performing one's job.  *See* 29 C.F.R. § 785.38 (providing

15   that "time spent by an employee in travel as part of his principal activity, such as travel from

16   job site to job site during the workday, must be counted as hours worked.").  *See also Vega v.*

17   *Gasper*, 36 F.3d 417, 424 (5th Cir. 1994) (holding that employees' time spent on employer's

18   buses traveling between remote job site and community where they lived was a

19   noncompensable "extended home-to-work-and-back commute," rather than an indispensable

20   part of performing their job, because the workers were not required to use the buses and did not

21   load tools or engage in activities for the benefit of the employer while riding on the buses);

22   *Dolan v. Project Construction Corporation*, 558 F. Supp. 1308, 1311 (D. Col. 1983) (holding

23   that employees were not entitled to compensation for the 20-30 minute bus ride from the main

24   camp to the job site.)  An exception to the general rule, however, is that even if the travel itself

25   is not an indispensable part of performing one's job, travel time is compensable if it "occur[s]

26   after the employee commences to perform the first principal activity on a particular workday

and before he ceases the performance of the last principal activity on a particular workday."

29 C.F.R. § 790.6(a).  This is known as the continuous workday rule.  *See IBP, Inc. v. Alvarez*,

546 U.S. 21, 28-29 (2005) (noting that "the Department of Labor has adopted the continuous

workday rule, which means that the 'workday' is generally defined as 'the period between the

commencement and completion on the same workday of an employee's principal activity or

activities.'"); *Jordan v. IBP, Inc*., 542 F.Supp.2d 790, 800 (M.D. Tenn. 2008) ("[P]reliminary

and postliminary activities are compensable under the FLSA . . . so long as they occur after the

workday has begun and before it has ended.").

      Plaintiffs' claim for travel time compensation appears to hinge entirely on their

assertion that their workday, i.e. their principal activity or activities, commences at the Local

19 dispatch hall, because they "must go from home to the dispatch hall to be hired and are

hired there."  Dkt. 108 at 7.  However, the Court has already rejected this argument.  Plaintiffs

have not offered any other evidence in these proceedings that travel from the dispatch hall to

the job site constitutes an "indispensable" part of their principal activities as longshoremen, or

that they perform any work or "principal activities" at the Local 19 dispatch hall that would

trigger the continuous workday rule.  *See Bernal*, 2010 WL 2599762 at *8-9 (holding that

travel time from an employer-owned dispatch office to a customer job site was not

compensable under the continuous workday rule because waiting time at the dispatch office

does not constitute "the start of the workday.").

      Finally, in light of the substantial evidence that the ILWU dispatch halls exist

predominantly for the benefit of longshoremen rather than employers, the Court cannot find

that plaintiffs' travel from the Local 19 dispatch hall to the job site was "pursued necessarily

and primarily for the benefits of the employer."  *Muscoda*, 321 U.S. at 598.  Thus, travel from

the dispatch hall, where plaintiffs are provided with job opportunities, to the worksite where

plaintiffs commence their principal activities, are part of plaintiffs' "ordinary home to work

travel which is a normal incident of employment" as longshoremen.  As Levias stated, "A job

from our dispatch hall, Local 19's dispatch hall typically is just a commute to the job site." Levias Dep. at 28.  Plaintiffs are not entitled to compensation under the FLSA for this commute.

2.      *Plaintiffs are Not Entitled to Compensation under the MWA*

Although the MWA is generally construed consistent with the FLSA, Washington has not adopted language similar to the Portal-to-Portal Act or EFCA.  *See Anderson v. Dep't of Social & Health Services*, 115 Wash.App. 452, 457 (2003).  As a result, the Washington Supreme Court has held that in order "to determine whether drive time is compensable [under MWA], we must examine the undisputed facts and assess whether [the employees] are 'on duty' at the 'employer's premises' or 'prescribed work place' within the meaning of WAC 296-126-002(8)."  *Stevens*, 162 Wash.2d at 47.  To determine whether employees are "on duty," the Court examines the extent to which an employer restricts or controls the employees' time.  *Compare Stevens*, 162 Wash.2d at 48-49 (holding that employees who commuted to and from home and the jobsite in company-owned vehicles, were required to remain available while en route, and were prohibited from engaging in personal activities or errands, carrying non-employee passengers or alcohol, disobeying traffic or parking laws, or failing to lock the vehicle were "on duty" at "a prescribed work place" for purposes of WAC 296-126-002(8)), *with Anderson*, 115 Wash.App. at 459 (holding that employees traveling on the state/employer-provided ferry were not on the employer's "premises" or "prescribed work place," and were not "on duty" during passage for purposes of WAC 296-126-002(8), because plaintiffs engaged in various personal activities such as reading, conversing, knitting, playing cards or video games, listening to music, and napping).

Based on the plaintiffs' deposition testimony, the Court cannot conclude that they are "on duty" "at the employer's premises" or a "prescribed work place" during their drive from the Local 19 dispatch hall to the work site.  Plaintiffs' travel is distinguishable from *Stevens*, because there is no evidence that PMA's employer-members restricted or otherwise controlled

1  plaintiffs' time during their commute.  *See Stevens*, 162 Wash.2d at 48-49.  Plaintiffs generally

2  drive their own vehicles, and are able to use any time following dispatch for personal purposes

3  or errands.  For example, Levias testified that he can run a personal errand or stop to pick up

4  food during his commute from the dispatch hall to the worksite.  Levias Dep. at 28.  Levias

5  also testified that he is not in contact with the dispatcher or employer during his drive "unless

6  you're going to be late or something."  *Id*. at 36.  Similarly, when asked to explain how

7  plaintiffs could be considered to be under PMA's control following dispatch, Levias only

8  stated that he thought his pay might be docked if he reported to the foreman after the

9  contractual shift start, although this has never happened to Levias or anyone he knows.  *See id*.

10  at 71-72.  Under these circumstances, plaintiffs' vehicles do not constitute a "prescribed work

11  place," and plaintiffs are not "on duty" within the meaning of the MWA during their travel

12  from the dispatch hall to the worksite.  *See Bernal*, 2010 WL 2599762 at *7-9.

13                E.    Plaintiffs' Wait Time at the Jobsite Is Not Compensable

14        Plaintiffs also allege that they "must spend time on the employer's premises to badge

15  through security and walk to the location of the safety meeting.  Employees are told that they

16  must report at a certain time.  In order to report at that time, they must actually arrive at the

17  Port gate . . . [within] enough time to badge through and walk to the safety meeting location."

18  Dkt. 108 at 15-16.  Plaintiffs allege that "the reasonable amount of time it takes to do this so

19  that an employee can arrive at the time required by the employer is compensable."  *Id*. at 16.

20  Plaintiffs also seek compensation for any pre-shift wait time "spent after they are hired."  *Id*.

21        Wait time may be considered part of the principal activity of employment, and

22  therefore compensable under the Portal-to-Portal Act, if it is primarily for the benefit of the

23  employer and the employee is not free to engage in other personal activities while he or she

24  waits.  *See Owens*, 971 F.2d at 350 (citing *Armour*, 323 U.S. at 132); 29 C.F.R. § 790.7(h)

25  ("Waiting time before the time established for the commencement of work would be regarded

26  as a [noncompensable] preliminary activity when the employee voluntarily arrives at his place

of employment earlier than he is either required or expected to arrive.  Where, however, an

employee is required by his employer to report at a particular hour [to the place] where he

performs his principal activity . . . but for some reason beyond his control there is no work for

him to perform until some time has elapsed, waiting for work would be an integral part of the

employee's principal activities.").  To determine whether wait time is spent primarily for the

benefit of the employer, federal courts generally consider four non-exhaustive factors:

(1) whether the agreements and understandings between the employer and employee indicate

that wait time will be compensated; (2) whether the employer requested or required that the

employee wait; (3) the degree to which the employee's free will is constrained during the wait

time or whether they can use the time for personal activities or purposes; and (4) the degree to

which the employer actually benefits from the wait time.  *See Owens*, 971 F.2d at 350-51;

*Bernal*, 2010 WL 2599762 at *3; *Vega*, 36 F.3d at 425.  In construing the MWA, Washington

courts have adopted these four factors as well.  *See Chelan County Deputy Sheriffs' Ass'n*, 109

Wash.2d at 292-93.

Here, plaintiffs have not proffered any evidence that the few minutes plaintiffs spend

walking or riding from the port gate to the muster area should be treated differently than other

time spent traveling from the Local 19 dispatch hall to the worksite.  As discussed above, this

travel time is noncompensable under the FLSA.  *See* 29 C.F.R. § 790.7(f) (providing that an

example "of walking, riding, or traveling which may be performed outside the workday and

would normally be considered [noncompensable] 'preliminary' or 'postliminary' activities

[under the FLSA] are . . . walking or riding by an employee between the plant gate and the

employee's . . . actual place of performance of his principal activity or activities[.]"); *Lindow*,

738 F.2d at 1064 (holding that FLSA "does not require employers to pay overtime for

'walking, riding, or traveling to and from the actual place of performance of the principal

activity or activities which such employee is employed to perform'[.]") (quoting 29 U.S.C.

§ 254(a)(1)).  This travel time is also noncompensable under the MWA, because although

plaintiffs have set foot on their employer's premises, they are not yet "on duty."  *See* WAC 296-126-002(8).

Plaintiffs' contention that they are entitled to compensation for wait time spent "badging through" the port gate, because their free will is constrained during this time, is also unpersuasive.  *See* Dkt. 108 at 15-16.  As discussed above, the parties' agreements do not provide that any pre-shift waiting time will be compensated.  With the exception of "flex starts," plaintiffs also do not allege that PMA's employer-members have ever requested or required plaintiffs to arrive at the worksite before the contractual shift start.  With respect to the third factor, the degree to which plaintiffs' free will is constrained during the wait time, plaintiffs have not provided any evidence that they are under PMA's employer-member's control while they "badge through" the port gate.  Rather, "badging through" the port gate appears to involve simply flashing identification that identifies plaintiffs as longshore workers.  For example, Levias testified that when he is dispatched to work as a lasher at SSAT, "once you arrive on the terminal, you present your ID.  You take the bus to the lunchroom and you find the foreman, check in with the foreman, and you sign in at that point."  Levias Dep. at 47.  Similarly, after driving from dispatch to the terminal parking lot at MTC, Levias testified that "you badge through again and you ride the security bus out to the . . . lunchroom," which takes only "a few minutes."  *Id.* at 55.  When Levias was asked if he tries to show up at the job site a little early, Levias responded, "Me?  No, I don't race to the terminal or be unsafe to get to where I'm – to get to the job site to pick the best equipment."  Levias Dep. at 126.

Because plaintiffs are not required to complete a security screening process that forces them to report early in order to report on time, *Cervantez v. Celestica Corp.*, the case cited by plaintiffs, is clearly distinguishable.  618 F.Supp.2d 1208, 1215 (C.D. Cal. 2009).  In *Cervantez*, employees were required to pass through security screening before entering the employer's facility, clock in at one of the time clocks within the facility, and be at their work station at the start of the shift.  *Id.*  In that case, "out of fear of clocking in late and losing pay,

1    they were forced to remain waiting in the security line and within the building after they have

2    passed through security, restricting the activities in which Plaintiffs can engage during this

3    uncompensated pre-shift period." *Id.* at 1214-15.  Although the plaintiffs were able to engage

4    in limited personal activities, such as conversing socially and drinking a cup of coffee, the

5    employees were effectively under the control of their employer during this entire pre-shift

6    period, because their pay would be docked if the employees were "even one minute late." *Id*.

7    at 1216.  That is clearly not the case here.  Although Levias asserted that his pay could

8    potentially be reduced if he was late in arriving at the muster area, he conceded that he has

9    reported to the muster location after the contractual start of the shift on several occasions and

10   his pay has never been docked.  Levias Dep. at 63, 72.  He is also unaware of anyone whose

11   pay has been docked for showing up late.  *Id*. at 72.

12          Moreover, plaintiffs do not allege that they report to the worksite early each day in

13   order to locate the correct muster area.  Although "there may be times where the foreman may

14   not be available readily" because "SSA[T] is a big terminal," Levias testified that

15   longshoremen are "supposed to" know where they are going to be mustering each day when

16   they leave the Local 19 dispatch hall.  *Id*. at 48.  Similarly, Lemon testified that he occasionally

17   does not remember where he was supposed to report at the terminal, "but you know, I can

18   always find out where I'm at . . . [if] I forget exactly where I'm being dispatched."  Lemon

19   Dep. at 122.

20          Finally, plaintiffs have failed to show that if they arrive early at the muster area, any

21   pre-shift wait time primarily benefits the employer.  *See Owens*, 971 F.2d at 350-51.  *See also*

22   *Lindow*, 738 F.2d at 1060-61 (holding that although "it was often the practice of the employees

23   to leave work up to 5 minutes before the end of their shifts" when other employees arrived

24   early to relieve them, the employees were not entitled to overtime compensation for their pre-

25   shift activities to the extent they "could have performed the pre-shift work during regular

26   hours" because "the [employer] did not formally reprimand, dock, or give a poor evaluation to

1   any employee for not reporting early."). To the contrary, plaintiffs can use any pre-shift wait

2   time for personal activities like reading a newspaper or socializing. *See* Levias Dep. at 56

3   (stating that what he does to pass any pre-shift time in the lunchroom "varies," and "you could

4   read newspapers or the foreman sometimes might give you other directions . . . You never

5   know what's going to happen."); Lemon Dep. at 49 (stating that he sometimes shows up at the

6   pier early and hangs out in the lunchroom because "[t]hat's where you're going to muster at.

7   That's where everyone is going to assemble[.]"). *See also* Dkt. 56 at 10 (Ventoza Decl.)

8   ("[E]mployees assemble or muster at the lunchroom to sign-in and to hear the foreman's safety

9   speech, which marks the start of the shift. While some people arrive at the last moment, others

10  arrive ahead of time and will hang out, read the paper, get something to eat, drink coffee, and

11  /or talk with co-workers in the lunchroom while waiting for the day's safety speech from the

12  foreman. That pre-shift time is an employee's own time."). Accordingly, plaintiffs are not

13  entitled to compensation under the FLSA or MWA for any pre-shift time spent walking or

14  riding from the port gate to the muster area, "badging through" the port gate, or waiting at the

15  muster area.

16      F.      Plaintiffs' Pre-Shift Preparatory Activities Are Not Compensable

17      Plaintiffs assert that "the donning of prescribed clothing, selecting equipment, [and]

18  performing safety checks on the equipment" are compensable preparatory activities under the

19  FLSA that they engage in before the beginning of their shifts. Dkt. 108 at 22. In particular,

20  plaintiffs allege that "doing a safety check of equipment to be used on the job, as Mr. Levias

21  testified . . . is no different than the 'donning' of safety clothing and is compensable." *Id.* at

22  16.

23      1.      *Plaintiffs' Donning of Non-Unique Protective Gear*

24      Although plaintiffs are required to don safety vests, hard hats, and hard-toed boots

25  before the start of their shift, they do not don any unique protective gear. *See* Levias Dep. at

26  62-63. Levias testified that once he arrives at the parking lot at the terminal, "[t]ypically you

1   put your gear on, your hardhat or safety vest, depending on your job.  Well, excuse me.  Every

2   time you go to the terminal, you're required to put on your safety vest, safety shoes."  *Id*. at 38-

3   39.

4           The Ninth Circuit in *Bamonte*, applying the "three-stage inquiry" to police officers'

5   donning of uniforms and related protective gear, held that this activity likely constitutes work

6   under the FLSA "as a function of the employer's requirement that the officers wear a uniform

7   and related protective gear."  *Bamonte*, 598 F.3d at 1225.  Nevertheless, the court held that a

8   claim for compensability "fatally falters" at the second stage if "[n]o requirement of law, rule,

9   the employer, or the nature of the work mandates donning and doffing [to be conducted] at the

10  employer's premises[.]"  *Id*. at 1233.  Specifically, the court cited with approval the DOL's

11  policy statement that "[i]f an employee . . . cannot perform his principal activities without

12  putting on certain clothes, changing clothes on the employer's premises at the beginning and

13  end of the workday would be an integral part of the employee's principal activity."  29 C.F.R.

14  § 790.8(c).  "Such a [compensable] situation may exist where the changing of clothes on the

15  employer's premises is *required by law, by rules of the employer, or by the nature of the*

16  *work*."  *Id*. n.65 (emphasis added).  In contrast, "if changing clothes is merely a convenience to

17  the employee and not directly related to his principal activities, it would be considered as a

18  'preliminary' or 'postliminary' activity rather than a principal part of the activity."  *Id*. §

19  790.8(c).  Thus, "the relevant inquiry is not whether the . . . safety gear itself is indispensable

20  to the job – they most certainly are – but rather, the relevant inquiry is whether the nature of

21  the work requires the donning and doffing process to be done *on the employer's premises*."

22  *Bamonte*, 598 F.3d at 1227-28 (emphasis added).  Where employees have the option and

23  ability to don the protective gear at home, regardless of whether it is "their preference to don

24  and doff at the workplace," this activity cannot be considered "integral and indispensable," i.e.,

25  "necessary to the principal work performed and done for the benefit of the employer."  *Id*. at

26  1225-26.

ORDER - 27

1    In *Alvarez*, the Ninth Circuit held that employees at a meat processing plant were

2   entitled to compensation for time spent donning, doffing, and retrieving job-related protective

3   gear before and after working on the production lines. *Alvarez*, 339 F.3d at 902-03 (applying

4   29 C.F.R. § 790.8(c) & n.65).  Specifically, the employees were required to "gather their

5   assigned equipment, don that equipment in one of the . . . plant's four locker rooms, and

6   prepare work-related tools before venturing to the slaughter or processing floor."  *Id.* at 898.

7   The *Alvarez* court opined that "because the donning and doffing of this gear on the plant's

8   premises is required by law, by rules of [the employer], and by the nature of the work, this

9   donning and doffing is necessary to the principal work performed."  *Id.* at 903.  *See also*

10  *Ballaris*, 370 F.3d at 903 (holding that employees were entitled to compensation for time spent

11  donning and doffing uniforms at a silicon wafer manufacturing plant, because "[h]ere, as in

12  *Alvarez,* [the employer] required [the employees] to change into and out of their uniforms at

13  the plant, and only at the plant, in the normal course of the employees' jobs.").

14    Plaintiffs, like the police officers in *Bamonte* and unlike the employees in *Steiner*,

15  *Alvarez*, and *Ballaris*, are not required by the rules of the PMA's employer-members, by law,

16  or by the nature of the work to don their non-unique protective gear on the employer's

17  premises.  *See Steiner*, 350 U.S. at 256; *Bamonte*, 598 F.3d at 1227-28; *Ballaris*, 370 F.3d at

18  911; *Alvarez*, 339 F.3d at 903.  Rather, plaintiffs have the option and ability to don their

19  protective gear at home, or anywhere they wish before the beginning of their shift.  *See* Levias

20  Dep. at 62-63; Dkt. 92 at 2 (Stearns Decl.) (providing that longshoremen are required to wear

21  steel-toed shoes and hardhats, but overalls are optional.  Longshoremen can "put these on

22  before reporting to work – in the parking lot or, if they want, at home before coming to

23  work.").  Thus, donning plaintiffs' safety vests, hard-toed shoes, and hardhats is not an

24  "integral and indispensable."

25    Furthermore, even if donning this non-unique protective gear were "integral and

26  indispensable," the Ninth Circuit has held the time it takes to don non-unique, as opposed to

1   unique, protective gear such as hardhats "is de minimis as a matter of law." *Alvarez*, 339 F.3d

2   at 903-04 (citing *Anderson*, 328 U.S. at 692). *See also Reich v. IBP, Inc.*, 38 F.3d 1123, 1126

3   n.1 (10th Cir. 1994) (holding that time spent donning and doffing non-unique protective gear,

4   although essential to the job and required by the employer, is so insubstantial and so difficult to

5   monitor that it is not "work," or alternatively, it is *de minimis* as a matter of law). Accordingly,

6   plaintiffs' claim fails under both the second and third stages of the relevant inquiry.

7                          2.      *Plaintiffs' Pre-Shift Selection of Equipment and Safety Checks*

8            Plaintiffs' final claim is that they are entitled to compensation for pre-shift time spent

9   selecting equipment and performing a safety check of equipment to be used on the job. *See*

10  Dkt. 108 at 16, 22. Specifically, plaintiffs testified that when their assignment for the day

11  involves driving equipment, they are not assigned to a particular piece of equipment but

12  generally can choose which equipment they would prefer to drive on a first-come-first-serve

13  basis. *See* Levias Dep. at 109, 126; Lemon Dep. at 37-38. As a result, many longshoremen

14  show up at the worksite a little early to select the equipment they would prefer to drive that

15  day. As Lemon explained, following dispatch from the ILWU dispatch hall, many

16  longshoremen

17              . . . rush over to secure their equipment . . . [because] [t]here are
18              certain equipment more desirable to drive than others . . . There's
                equipment shortage in the Port of Seattle and there's certain –
19              when you get a job, there's certain equipment you want to drive
                – you would rather drive, I should say. Be it strad, be it truck,
20              you know, even a supervisor in a regular truck, there are certain
                trucks you want to have as opposed to others . . . Certain ones
21              you want to operate, I should say.

22  Lemon Dep. at 37-38. Similarly, Levias testified that "there's some [equipment] that I

23  probably wouldn't want to drive or feel safe in." Levias Dep. at 125. However, Levias

24  asserted that "I don't race to the terminal or be unsafe to get to where I'm – to get to the job

25  site to pick the best equipment." Levias Dep. at 126.

26

1        It is undisputed that plaintiffs "are required per safety code to perform . . . safety checks

2    before operating the equipment" at SSAT, Eagle, or MTC, and that no safety check is required

3    for jobs that do not involve equipment such as a sling man, lasher, or other non-skilled work.

4    *Id.* at 71, 48, 50-54, 62.  Levias testified that the safety training manuals provide that the safety

5    check must be performed "at the beginning of each shift," but "[i]t doesn't say a time, no."  *Id.*

6    at 128.  He also testified that he does not recall a foreman ever telling him to complete the

7    required safety check before the scheduled start time.[8]  *Id.*  Similarly, when Lemon was asked

8    to explain the basis for his understanding that he is required to select his top pick before the

9    safety talk that marks the beginning of the shift, Lemon responded,

              That's just the way it's done, you know.  When you walk into the
10            gate, you find your equipment, you get your equipment and
              somehow make your way to the break room where everyone is
11            . . . I'm just saying that's the way it's done . . . No one – I don't
              believe it's written down somewhere that that's the way it has to
12            be.  But you find your equipment and you drive that equipment
              to the ship, to the job site, you know.
13

14

15   Lemon Dep. at 125.  When asked again if he usually picks out his equipment before mustering

16   at the lunchroom "because that's just the way it's always been done," Lemon qualified his

17   previous testimony, "No.  I think that – I want to say that one time we went straight to the

18   break room and then we did it.  I want to say that."  *Id.* at 127.

19

20   _____

21        [8] Although Levias subsequently stated in his declaration submitted with his surreply that "I was
     never told that a two-minute safety check had to be performed before the start of the shift, because this
22   requirement is in the safety manual and everyone is required to comply with the safety manual," Dkt.
     120 at 2 (Levias Decl.), plaintiffs have not provided a copy of the relevant portion of the safety manual
23   to support Levias' statement as required by Rule 56.  *See* Fed. R. Civ. P. 56(e)(1) (version in effect on
     November 19, 2010, the noting date in this action) (providing that "[i]f a paper or part of a paper is
24   referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.").
     Moreover, his statement is contrary to both Levias' and Lemon's testimony, discussed above, that the
25   two-minute safety check is not required to be performed before the start of the shift.  Levias'
     conclusory assertion is therefore insufficient to withstand summary judgment.  *See Leer v. Murphy*, 844
26   F.2d 628, 633 (9th Cir. 1988).

1    Levias testified that this safety inspection generally takes "just a couple minutes."

2    Levias Dep. at 41.  Specifically, the time involved can vary "between two minutes or more,"

3    although on no more than five occasions has an equipment safety check taken Levias longer

4    than two minutes.  *See id.* at 137-38.  For example, the time spent performing a safety check on

5    "forklifts could vary from just, you know, 30 seconds or so, depending on how quick or slow

6    the person is performing the safety check . . . how old the equipment is and . . . various other

7    conditions, if there's old hydraulic fluid leaking or grease from a rainy day from the shift

8    before."  *Id.* at 138.  In addition, "in the winter months or something like that . . . if the

9    equipment is not warmed up . . . you have to de-ice the windshield and make sure the

10   equipment is running properly at that cold temperature."[9]  *Id.* at 68-69.  On cold days, Levias

11   stated that plaintiffs might report to the foreman later than the contractual start of the shift.  *See*

12   *id.* at 69.

13   Plaintiffs' equipment safety inspection constitutes an "integral and indispensable" duty

14   and therefore satisfies the second stage of the three-stage inquiry, because plaintiffs are

15   required by law, by the rules of the employer, or by the nature of the work to complete an

16   equipment safety check on the employers' premises before operating the equipment.  *See*

17   *Steiner*, 350 U.S. at 252; *Ballaris*, 370 F.3d at 910-12; *Alvarez*, 339 F.3d at 901.  However, this

18   activity fails to satisfy the first and third stages.  *See Bamonte*, 598 F.3d at 1224-25.

19   Specifically, plaintiffs have not satisfied the first requirement by showing that the pre-

20   shift equipment safety checks are performed "necessarily and primarily for the employers'

21   benefit," because although these safety checks are required by PMA's employer-members

22   before plaintiffs operate the equipment, they are not required to be performed before the

23   beginning of the shift.  In *Lindow*, the Ninth Circuit held that plaintiffs who performed

24

25   ⁹  PMA's evidence is consistent with plaintiffs' testimony.  *See* Dkt. 51, Att. 8 at 2 (Hunter
     Decl.) ("On a cold day [at SSAT], if the [semi] was not used on a previous shift, maybe [the semi-

26   operators] have to wipe the windows down, and they're supposed to look over the vehicle for obvious
     problems[.]").

1   otherwise compensable work before the beginning of their shift for their own convenience, and

2   who could have instead performed the work during regular hours, were not entitled to

3   compensation where the employer "did not pressure or even encourage the employees to report

4   early to work." *Lindow*, 738 F.2d at 1061.  The MWA follows this approach as well.  *See* Dkt.

5   99, Ex. A (Dept. of Labor & Indus., Employment Standards No. ES.C.2 at § 9, providing that

6   "preparatory and concluding activities," including "preparation of equipment for the day's

7   operation, i.e., greasing, fueling, warming up vehicles; cleaning vehicles or equipment;

8   loading, and similar activities," are only considered "hours worked" under the MWA where

9   "an employee does not have control over when and where such activities can be made.").

10          In this case, plaintiffs testified that they perform the required equipment safety checks

11   before the beginning of their shift primarily for their own convenience, rather than the

12   convenience of their employers.  Specifically, plaintiffs testified that they were not directed or

13   required to select their equipment and perform the safety checks before the beginning of their

14   shifts, but typically arrived early in order to select their preferred piece of equipment.  *See*

15   Levias Dep. at 71, 48, 50-54, 62, 128; Lemon Dep. at 125, 127.  *See also* Dkt. 51, Att. 8 at 2

16   (Hunter Decl.) (providing that at SSAT in Seattle, "[s]emi-operators are on time if they go

17   through the gate at 8 o'clock; however, if the dispatch is on time or early, they may show up

18   early in order to get their choice of vehicle.  It's not the company's requirement.  When

19   dispatch runs late, the operators are not on a piece of equipment until 8 o'clock, when the shift

20   starts."); *id*., Att. 10 at 3 (Pickles Decl.) ("At Eagle Marine, we want the workers to be on the

21   job by 8 o'clock, although if they are late by ten or fewer minutes, this is not unusual and there

22   are no consequences for the worker.").  Because it appears that plaintiffs voluntarily performed

23   the required safety checks before the beginning of the shift "for their own convenience rather

24   than for the company's benefit," they are not entitled to compensation for these activities under

25   the FLSA or the MWA.  *Lindow*, 738 F.2d at 1061.

26

The third and final step in the compensability analysis is a determination of whether otherwise compensable time is *de minimis*.  *See Lindow*, 738 F.2d at 1063 (providing that "we will consider (1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work.").  The Ninth Circuit has observed that "periods of approximately 10 minutes" are often considered *de minimis*, although a court must also consider whether the plaintiffs' claims "might have been minimal on a daily basis but, when aggregated, amounted to a substantial claim."  *Id.* at 1062-63 (citing cases finding periods between two and fifteen minutes *de minimis*).  *Compare Alvarez*, 339 F.3d at 903-04 (holding that time spent donning and doffing safety goggles and hardhats is so insubstantial and difficult to monitor that it is incompensable as *de minimis*), *with Ballaris*, 370 F.3d at 912 ("Here, the time is apparently not similarly insubstantial.  Nor is it difficult to monitor.  Plaintiffs presented evidence that some 20 to 30 minutes were spent daily by Fab 2 employees performing these tasks; [defendant] disagrees but offers no estimate of its own.  Because the amount of time is in dispute, there is a genuine issue of material fact to be resolved by the fact-finder on remand.").

Plaintiffs argue generally that "[d]efendants have failed to submit[] a detailed accounting of each job worked by Plaintiffs obtained through the dispatch hall . . . they have not shown that any time worked was de minimis on any given day or in the aggregate."  Dkt. 108 at 10.  Although plaintiffs are correct that there is no record of the time plaintiffs have spent "just to perform the safety checks," it is undisputed that the time involved is never more than thirty seconds to "just a couple of minutes."  Levias Dep. at 41, 181.  For example, on no more than five occasions has an equipment safety check taken Levias over two minutes.  *See id.* at 138.  Furthermore, plaintiffs only perform safety checks on days when they are operating equipment.

Finally, as in *Lindow*, it would likely be administratively difficult for PMA's employer-members to monitor and record the precise amount of time spent by plaintiffs performing these

1  brief pre-shift safety checks, as opposed to other social or personal pre-shift activities.  Thus,

2  even if the time spent by plaintiffs selecting equipment and performing the safety checks – in

3  the aggregate – is substantial,[10] the Court finds the compensable time at issue is *de minimis* as a

4  matter of law.  *See Lindow*, 738 F.2d at 1064.  Because any pre-shift time spent selecting

5  equipment or performing equipment safety checks is not "necessarily and primarily for the

6  employer's benefit" and is *de minimis*, plaintiffs are not entitled to compensation for these

7  activities under the FLSA or MWA.

V.    CONCLUSION

8

9       In light of the Court's finding that plaintiffs are not entitled to compensation under

10  either the FLSA or MWA for pre-shift travel time from the Local 19 dispatch hall to the

11  employer-member's jobsite, travel time from the port gate to the muster area, wait time at the

12  jobsite, or time spent performing preparatory activities, it is unnecessary to address the parties'

13  remaining contentions.  *See* Dkt. 96 at 23-29; Dkt. 108 at 16-22.  For the foregoing reasons,

14  PMA's and ILWU's summary judgment motions, Dkts. 96 and 102, are GRANTED, and this

15  case is DISMISSED with prejudice.

16       DATED this 7th day of January, 2011.

17

18  JAMES P. DONOHUE
    United States Magistrate Judge
19

20

21

22

23

24

---

25       [10] For example, if plaintiffs had performed a two-minute equipment safety check prior to every shift during the last three years, Lemon would have spent approximately 43 hours performing this

26  activity and Levias would have spent approximately 25 hours performing this activity.  *See* Dkt. 52, Ex. G (plaintiffs' work records).

ORDER - 34